John **BARREN**, an incompetent, by his guardian, Henrietta **BARREN**,

v.

**UNITED STATES of America,**
**Appellant.**

No. 87–5314.

United States Court of Appeals, Third Circuit.

Argued Nov. 2, 1987.

Decided Feb. 23, 1988.

Rehearing and Rehearing En Banc Denied March 28, 1988.

Sal Cognetti, Jr. (argued), Timothy E. Foley, Bour, Gallagher, Foley, Cognetti, Cowley & Douglass, Scranton, Pa., for appellant.

Richard K. Willard, Asst. Atty. Gen., James J. West, U.S. Atty., John F. Cordes, Katherine S. Gruenheck (argued), Appellate Staff, Civ. Div., U.S Dept. of Justice, Washington, D.C., for appellee.

Before SLOVITER, BECKER, and COWEN *, Circuit Judges.

* At the time this case was argued, Judge Cowen was a United States District Judge for the District of New Jersey sitting by designation. On November 16, 1987 he entered on duty as a United States Circuit Judge.

## OPINION OF THE COURT

COWEN, Circuit Judge.

This appeal is from an order which entered judgment in favor of plaintiff awarding damages on a claim of medical malpractice, brought pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.* Since plaintiff failed to file his notice of claim within two years after its accrual, as required by 28 U.S.C. § 2401(b),[1] and the time in which he had to make his claim was not tolled or otherwise excused, his claim was time-barred. We therefore will reverse the judgment in plaintiff's favor.

## I.

Plaintiff, John Barren, enlisted in the United States Army on June 22, 1970. After completing basic training, he was sent on a tour of duty in Korea, arriving in November of 1970. Barren was stationed at Camp Casey, in the demilitarized zone, which was considered hazardous duty. Over the next thirteen months, he experienced increasing amounts of nervousness and anxiety, and his condition worsened to the point that on January 2, 1972, he was transferred to Fort Lewis, Washington. During the trip home, Barren was given librium (a tranquilizer) by military personnel, presumably in an effort to temporarily relieve his condition. Upon arriving at Fort Lewis, he was medically discharged and was advised to seek a physical examination at a Veterans Administration ("VA") hospital.

Barren returned to Pennsylvania on January 5, 1972, and on January 12 reported to the VA hospital in Wilkes–Barre, Pennsylvania, complaining of heart palpitations and a skin rash. Due to his recent separation from active duty, the VA informed Barren that he was eligible for treatment pending a final determination whether his illness was service related. On January 17, 1972, he was again examined at the VA hospital and prescribed medication. The preliminary diagnosis was heart palpitations and anxiety.

In early August of 1972, Barren had a psychiatric out-patient consultation with Dr. George Anghel of the VA. Dr. Anghel, who was not board certified in psychiatry, diagnosed plaintiff as suffering from adolescent adjustment syndrome, and prescribed librium and valium. Dr. Anghel treated Barren on an out-patient basis on four other occasions, each time continuing to prescribe tranquilizers.

On January 24, 1973, on the basis of Dr. Anghel's diagnosis, the VA determined that the skin condition Barren had developed was service related, but that his anxiety problem was not. It therefore denied his disability claim for the anxiety condition. Barren sought reconsideration of this decision and, as part of the review process, was again examined by Dr. Anghel on May 9, 1973.[2] Dr. Anghel reported his condition as "adjustment reaction of adolescence." On July 6, 1973, based on Dr. Anghel's report in which he opined that Barren's personality was healthy and that he did not need hospitalization, the VA denied his disability claim. On August 2, 1973, the VA informed Barren it had determined that his nervous condition was not service related. Barren again appealed, this time to Mr. Watson, Chief of Admissions at the VA hospital. While this appeal was pending, Barren's family continued to seek hospitalization on his behalf and reported to Dr. Anghel that he was uncontrollable and needed immediate psychiatric hospitalization. The Chief of Admissions, after consulting with Dr. Anghel, denied Barren's request for hospitalization on January 11, 1974. In late January of 1974, Barren's

---

1. The section states:
   (b) A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.

28 U.S.C. § 2401(b) (1982).

2. The district court noted that review of a disability claim by an applicant's treating physician is not standard VA procedure, and Dr. Anghel admitted that this practice was "not too ethical." In this case, however, Dr. Anghel performed the evaluation because there was no other doctor available at the time. App. at 26, 38.

family admitted him to the Scranton State Psychiatric Hospital for treatment of his alcoholism, a condition he developed in an effort to self-medicate. He was released on February 1, 1974, as the treatment was unsatisfactory to his family.

On February 18, 1974, Barren was placed in the care of Dr. J. Paul Hurst, who immediately admitted him to Abington Memorial Hospital, where he was diagnosed as suffering from immature personality disorder, depression neurosis and chronic lumbosacral sprain. Barren was released from Abington on March 3, 1974, when his family could no longer bear the financial burden of in-patient treatment. Thereafter and continuing to the present, Dr. Hurst has continued to treat Barren on an out-patient basis, with the exception of another hospitalization at the Eastern Pennsylvania Psychiatric Institute lasting from June 26 until July 26, 1974, at which time Barren was diagnosed as having anxiety neurosis.

On October 30, 1977, the VA reversed its prior decision and determined that Barren's anxiety condition was service related. The VA awarded Barren a 30 percent disability retroactive to February 26, 1973. This rating was subsequently increased to 50 percent on March 15, 1979, and to 100 percent on October 18, 1984.

Barren filed his administrative tort claim on September 7, 1979, alleging medical malpractice. Barren's sister, Henrietta Barren, filed a tort claim on the same date, seeking reimbursement for medical related expenses she incurred on behalf of her brother. This suit was filed on September 15, 1981. Barren and his sister, Henrietta Barren,[3] alleged that the VA had negligently failed to admit him to the hospital for in-patient care, and that the treatment he was given was substandard. The United States moved to dismiss because the claims were not timely filed. The district court declined to dismiss, preferring to reserve decision until after the liability portion of Barren's case. After hearing all the evidence, the district court did dismiss the claims of Henrietta Barren as time-barred, but refused to do so as against Barren.[4]

The district court determined that Barren's diminished mental condition, which condition resulted from defendant's malpractice, was a factor which could be considered in assessing the reasonableness of his diligence in discovering the malpractice. App. at 32. The court concluded that Barren's mental condition affected his ability to understand that an injury had befallen him. *Id.* at 33. The district court further concluded that Barren, unlike his sister, through the exercise of reasonable diligence could not have discovered his injury prior to October 1977—the date he was notified of the VA's decision to amend his disability to 30 percent service related. *Id.* This appeal followed findings by the district court of medical negligence by the government and damages sustained by Barren.

## II.

The fundamental issue raised in this appeal is when does the statute of limitations run on a FTCA medical malpractice claim, when the plaintiff proves that the medical negligence of the government so affected his mental facilities that he was incapable of perceiving the negligence of the government. The answer to this question is determined by the date on which this Court determines such a cause of action accrues under 28 U.S.C. § 2401(b). The district court's findings of fact in this regard will be left undisturbed unless clearly erroneous. *Anderson v. City of Bessemer*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.

**3.** Henrietta Barren filed this suit, not only in her own right to recover the funds she spent to cure her brother, but also on behalf of her brother for whom she was appointed guardian in June of 1981.

**4.** The district court found as to Henrietta Barren's claim in her own right, that evaluating her knowledge of the existence of the injury (Barren's obvious mental deterioration) as well as the probable cause of that injury (failure of the VA to promptly hospitalize and properly treat his mental and nervous disorder), she was aware of the accrual of the cause of action well before the two years that she filed the administrative claim. In evaluating her knowledge the district court correctly judged her by the reasonable person standard.

2d 518 (1985). However, where the decision of the district court involves the application and interpretation of legal precepts, this Court's review is plenary. *D & G Equip. Co. v. First Nat'l Bank*, 764 F.2d 950, 954 (3d Cir.1985).

### III.

The United States Supreme Court has in general terms addressed the issue of when a medical malpractice claim accrues under the FTCA in *United States v. Kubrick*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979). In *Kubrick*, the plaintiff sustained a partial hearing loss allegedly as a result of neomycin treatment administered for a femur infection. Thereafter, Kubrick sought the advice of other doctors, who advised him as early as January of 1969 that it was "highly possible" that the neomycin treatment had caused his deafness. 444 U.S. at 114, 100 S.Ct. at 355. The district court in *Kubrick* held that the claim was timely because it was filed within two years after plaintiff spoke with yet another doctor, in June 1971, who stated that "neomycin had caused [Kubrick's] injury and should not have been administered." *Id.*

In *Kubrick* the district court determined that the plaintiff was not subject to the usual discovery rule because he had demonstrated that "he had exercised reasonable diligence and had no 'reasonable suspicion' that there was negligence in his treatment." *Id.* at 116, 100 S.Ct. at 356 (quoting *Kubrick v. United States*, 435 F.Supp. 166, 185 (E.D.Pa.1977). We affirmed, *Kubrick v. United States*, 581 F.2d 1092 (3d Cir.1978), holding that the statute of limitations is tolled "if the plaintiff can prove that in the exercise of due diligence he did not know, nor should he have known, facts which would have alerted a reasonable person to the possibility that treatment was improper...." *Id.* at 1097. The Supreme Court reversed, the majority finding nothing in the language or the legislative history of the FTCA to support our holding that Kubrick's claim only accrued when he knew or reasonably could have known that

his neomycin treatment was medically substandard. Rather, the Court, recognizing that it was not free to enlarge the statute of limitations so as to frustrate the intent of Congress to promptly dispose of FTCA claims, refused to toll the limitations period for plaintiffs who possess the necessary facts to pursue a claim. The Court stated:

> We thus cannot hold that Congress intended that "accrual" of a claim must await awareness by the plaintiff that his injury was negligently inflicted. A plaintiff such as Kubrick, armed with the facts about the harm done to him, can protect himself by seeking advice in the medical and legal community. To excuse him from promptly doing so by postponing the accrual of his claim would undermine the purpose of the limitations statute, which is to require the reasonably diligent presentation of tort claims against the Government. If there exists in the community a generally applicable standard of care with respect to the treatment of his ailment, we see no reason to suppose that competent advice would not be available to the plaintiff as to whether his treatment conformed to that standard.... But however or even whether he is advised, the putative malpractice plaintiff must determine within the period whether to sue or not, which is precisely the judgment that other tort claimants must make.

444 U.S. at 123–24, 100 S.Ct. at 360 (footnote omitted).

The Supreme Court concentrated on the objective aspects of the test; that is, the Court was not concerned with whether the plaintiff actually knew of the malpractice, but whether he possessed the facts such that, as a reasonable person, he should have known of the malpractice. *Id.; accord Nemmers v. United States*, 795 F.2d 628, 631 (7th Cir.1986). In the case presently before us, the district court determined that Barren was only placed on notice that his disability was service related when the VA changed its position and awarded Barren a 30 percent disability rat-

ing on October 20, 1977.[5] App. at 29. It is clear to us, however, that based on the record below Barren possessed facts which would have enabled a reasonable person to discover the alleged malpractice well before this date.[6]

It is not disputed that plaintiff was denied admission by the VA on several occasions beginning in December of 1972, despite the intervention of his family. App. at 35. It is also obvious that his condition gradually worsened during this period. *Id.* at 35–36. Plaintiff's condition eventually deteriorated to the point that he sought outside medical treatment from Dr. Hurst in February 1974. *Id.* at 36. It was at this point that an objectively reasonable person in Barren's position could have recognized that the treatment he had received from the VA was not adequate, and that he had been harmed as a result.

The very fact that Barren sought treatment outside the VA is a clear indication that he believed the treatment provided by the VA was unsatisfactory. Moreover, the testimony of all the experts at trial was to the effect that the treatment given plaintiff by the VA during the years 1972–73 was inadequate and that he should have been hospitalized. *Id.* at 43–46. Indeed, the essence of Barren's claim is that because the VA failed to admit him for observation and treatment, his condition resulting from service in Korea retrogressed from moderate to total psychiatric disability. There is no

reason why this opinion of malpractice could not have been elicited as early as 1974. In fact, the district court found that there was no reason why Barren's sister, Henrietta Barren, did not discover or through the exercise of reasonable diligence should not have discovered the injury and its cause at an earlier date. *Id.* at 33. Viewing Barren's sister as an objectively reasonable person, her failure to timely interpose a claim under the FTCA is indicative of the very same failure on the part of Barren to timely file his claim.[7]

## IV.

Admittedly, the VA's malpractice was a substantial factor in Barren's inability to recognize that very malpractice. The undisputed evidence before the district court was that Barren could not recognize his condition and its deterioration between 1972 and 1974, and that the deterioration was a substantial factor in his inability to appreciate his condition. *Id.* at 47. The *Kubrick* Court acknowledged the difficulty that a plaintiff might have in discovering an act of medical malpractice, but nonetheless dismissed this as an excuse for allowing plaintiffs a lesser standard for complying with statutes of limitations:

> [D]etermining negligence or not is often complicated and hotly disputed, so much so that judge or jury must decide the issue after listening to a barrage of conflicting expert testimony. And if in this

5. We fail to see how this decision by the VA in and of itself could have placed Barren on notice that his injuries were related to the VA's malpractice, especially when the change of position by the VA was not accompanied by an explanation. The change in status from zero to 30 percent represents the opinion of the VA that plaintiff's condition partially related to his service in the armed forces, but would not necessarily imply an admission on the part of the VA that his condition was related to VA malfeasance. We therefore are of the opinion that the district court's finding that Barren was placed on notice as of October 1977 by reason of this change in status is unsupported by the evidence.

6. We must emphasize that Barren's situation cannot be characterized as one akin to a perpetration of a fraud or a continuing treatment by a physician, or the development of a transference relationship by a patient with her doctor

(as in *Greenberg v. McCabe*, 453 F.Supp. 765 (E.D.Pa.1978), *aff'd*, 594 F.2d 854 (3d Cir.), *cert. denied*, 444 U.S. 840, 100 S.Ct. 78, 62 L.Ed.2d 51 (1979)), which might mask the malpractice and excuse the failure to timely file a claim. Rather, this case involves an act or acts of malpractice which were temporally limited and which did not continue.

7. If Barren's sister had been appointed guardian prior to 1981, her knowledge would have been imputed to him, and Barren would thereafter have been precluded from arguing that the VA's negligence prevented him from discovering the malpractice. A deliberate delay in the appointment of a guardian, under plaintiff's view of the statute of limitations, could allow an incompetent plaintiff to circumvent the statute of limitations. There is no reason why such a delay in the appointment of a guardian should work to the detriment of the government.

complicated malpractice case, the statute is not to run until the plaintiff is led to suspect negligence, it would be difficult indeed not to apply the same accrual rule to medical and health claims arising under other statutes and to a whole range of other negligence cases arising under the Act and other federal statutes, where the legal implications or complicated facts make it unreasonable to expect the injured plaintiff, who does not seek legal or other appropriate advice, to realize that his legal rights may have been invaded.

444 U.S. at 124, 100 S.Ct. at 360.

Although the VA's exacerbation of Barren's infirmity, and the causal relationship between this aggravation and plaintiff's inability to recognize his condition is a compelling reason to excuse his deficiency in failing to file his claim, as *Kubrick* makes clear, the rule cannot be subjectively applied. Allowing Barren to file later than an objectively reasonable person would be tantamount to ruling that a plaintiff's mental infirmity can extend the statute of limitations. Such extensions have uniformly been rejected by this and other courts of appeals. *See Kichline v. Consolidated Rail Corp.*, 800 F.2d 356, 360–61 (3d Cir. 1986) (Federal Employer's Liability Act claim); *Accardi v. United States*, 435 F.2d 1239, 1241 n. 2 (3d Cir.1970); *Casias v. United States*, 532 F.2d 1339, 1342 (10th Cir.1976); *Williams v. United States*, 228 F.2d 129, 132 (4th Cir.1955), *cert. denied*, 351 U.S. 986, 76 S.Ct. 1054, 100 L.Ed. 1499 (1956) (Admiralty Act claim).

We recognize that our holding in this case visits a harsh result on the plaintiff. However, limitations periods must be strictly construed, especially those involving a waiver of sovereign immunity. *Kubrick*, 444 U.S. at 117–18, 100 S.Ct. at 356–57; *Soriano v. United States*, 352 U.S. 270, 276, 77 S.Ct. 269, 273, 1 L.Ed.2d 306 (1957); *United States v. Sherwood*, 312 U.S. 584, 590–91, 61 S.Ct. 767, 771–72, 85

L.Ed. 1058 (1941). As the Supreme Court has conceded:

> It goes without saying that statutes of limitations often make it impossible to enforce what were otherwise perfectly valid claims. But that is their very purpose, and they remain as ubiquitous as the statutory rights or other rights to which they are attached or are applicable. We should give them effect in accordance with what we can ascertain the legislative intent to have been.

444 U.S. at 125, 100 S.Ct. at 361. We feel compelled by the Court's holding in *Kubrick* to construe the statute of limitations narrowly. As the *Kubrick* Court noted, if Congress desires to expand the limitations period in cases where the government's own negligence prevents a plaintiff from recognizing her injuries caused by that conduct, it is free to do so. *Id.* The courts are not so empowered.[8]

## V.

We hold that the district court incorrectly applied the legal standard in assessing the timeliness of plaintiff's claims under section 2401(b), and in effect improperly tolled the statute of limitations. Because plaintiff's claim was not timely filed, and the running of the statute of limitations on an action brought against the United States is a jurisdictional defect not subject to waiver, *see e.g., Deakyne v. Department of Army Corps of Engineers*, 701 F.2d 271, 274 n. 4 (3d Cir.), *cert. denied*, 464 U.S. 818, 104 S.Ct. 78, 78 L.Ed.2d 89 (1983); *Rosales v. United States*, 824 F.2d 799, 802 (9th Cir.1987); *Houston v. United States Postal Service*, 823 F.2d 896, 902 (5th Cir. 1987); *Walters v. Secretary of Defense*, 725 F.2d 107, 112 n. 12 (D.C.Cir.1983), the district court is divested of jurisdiction under 28 U.S.C. § 1346(b). We therefore will reverse the district court's judgment and remand. The district court will enter judgment in favor of the United States. Each party to bear its own costs.

---

**8.** The government also argues that the district court erred in refusing to allow the United States the benefit of immunity granted to all private individuals under the Pennsylvania Mental Health and Mental Retardation Act of 1966, 50 Pa.Stat.Ann. § 4603 (Purdon 1969) (repealed 1978), or the Mental Health Procedures Act of 1976, 50 Pa.Stat.Ann. § 7114 (Purdon Supp. 1987). In light of our holding as set forth above we need not reach this issue.

SLOVITER, Circuit Judge, concurring.

I agree that the district court erred in rejecting the government's affirmative defense of the statute of limitations, but because my analysis differs somewhat from that of Judge Cowen, I write separately.

It is undisputed that as a result of his Army experience in Korea, plaintiff John Barren suffers from a disability, which the district court described as chronic anxiety disorder. App. at 56. Indeed, the Veteran's Administration awarded plaintiff a thirty percent disability rating retroactive to February 26, 1973, increased it to fifty percent as of August 23, 1977, and awarded him 100% disability on October 18, 1984. At issue here is not whether plaintiff had an unfortunate service-connected disability, or when it became totally disabling, but whether plaintiff is entitled to damages of $1,124,000 awarded him by the district court for defendant's malpractice.

Plaintiff's tort claim, in essence, is that the malpractice of the United States was committed between August 1972 and April 1974 when Dr. George Anghel misdiagnosed Barren's condition as a mere adolescent adjustment reaction and prescribed tranquilizers rather than the appropriate treatment of hospitalization which had been requested by John's sister, Henrietta, who consulted directly with Dr. Anghel on John's behalf.

The Federal Torts Claim Act (FTCA) provides that:

> A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues....

28 U.S.C. § 2401(b) (1982).

Barren must show that his claim accrued less than two years before presentation of his claim. Barren's administrative claim was not presented to the United States until September 7, 1979. His sister also presented her own claim on that date for medical expenses made on his behalf.

As the district court correctly recognized, "a claim under the FTCA accrues when a plaintiff knows both the existence and cause of his injury," citing to *United States v. Kubrick*, 444 U.S. 111, 122–23, 100 S.Ct. 352, 359–60, 62 L.Ed.2d 259 (1979). App. at 30. Applying this rule, the district court held that the claim of Henrietta Barren in her own right was barred by the statute of limitations because there was no evidence why she did not discover or through the exercise of reasonable diligence should not have discovered the injury claimed and its cause. App. at 33.

The district court, however, distinguished between Henrietta and John Barren. The court held that John Barren's "mental condition affected his ability to understand that" the Veteran's Administration aggravated the injury that he had suffered as a result of his tour of duty in Korea. App. at 32–33. According to the district court, "plaintiff's mental condition at the time of the allegedly negligent conduct, and which resulted from that conduct, may be considered part of the external circumstances under which the reasonableness of a plaintiff's diligence in discovering the wrong must be assessed." App. at 32. Although I recognize the attractiveness of this position, I believe it runs counter to the applicable law and legal precedents.

Plaintiff concedes that "with limited exceptions not applicable here, the existence of a mental capacity [sic] does not toll the running of the statute of limitations under the FTCA." Brief for appellee at 24 (footnote omitted). Nonetheless, plaintiff argues that the district court was justified in considering plaintiff's mental incapacity as "one of the many factors" to be weighed in determining the reasonableness of plaintiff's diligence in discovering the cause of his injury.

The distinction made by the district court is illusory. The basis for the general rule that the statute of limitations will not be tolled for either infancy or insanity, *see* 2 L. Jayson, *Handling Federal Tort Claims: Administrative and Judicial Remedies* §§ 297.02–.03 (1987), stems from the prevailing reasonable person standard used to determine when the claim, particularly a medical malpractice claim, should have been discovered. *See, e.g., Kubrick*, 444 U.S. at 123 n. 10, 100 S.Ct. at 360 n. 10

(plaintiff must exercise "reasonable diligence"); *Urland v. Merrell–Dow Pharmaceuticals, Inc.,* 822 F.2d 1268, 1275 (3d Cir.1987) (Pennsylvania inquiry is "whether plaintiffs knew or reasonably should have known"). The standard is an objective one, consistent with the purpose of the FTCA to "encourage the prompt presentation of claims." *Kubrick,* 444 U.S. at 117, 100 S.Ct. at 357. Neither the plaintiff nor the district court cites any persuasive authority for applying a subjective standard, *i.e.,* reasonableness as viewed from the plaintiff's individual situation. In fact, precisely such a subjective standard was rejected in *Kubrick,* where the Supreme Court, in reversing this court's holding of when a claim accrued for purposes of the FTCA statute of limitations, held an "untutored plaintiff" to the same standard as a "reasonable person". *See id.* at 118, 100 S.Ct. at 357.[1]

Inclusion of a plaintiff's mental incapacity as a factor to be considered in determining the reasonableness of plaintiff's diligence runs counter to this general approach. Indeed in this case, the *only* factor that distinguished plaintiff's situation from that of his sister was his mental incapacity. Since that interposes an impermissible subjective element into the reasonable person standard, *see* Restatement (Second) of Torts, §§ 283B, 283C (1964), the district court's reliance on the plaintiff's mental incapacity was legal error.

Plaintiff also argues that the usual discovery rule should be relaxed because "the injury sustained by [him] at the hands of the defendant was an aggravation of a pre-existing condition." Brief of Appellee at 29. I fail to see how a principled distinction can be made for purposes of the statute of limitations between a plaintiff whose mental disability was caused by defendant's negligence and one whose mental disability was aggravated by defendant's negligence. In either case, plaintiff's failure to file a timely claim may have resulted from his or her inability to recognize or appreciate the factors which form the basis of the claim. Logic requires that both situations should be treated similarly. Since both the district court and plaintiff concede that mental disability as such is not a basis for relaxing the statute of limitations, it follows that aggravation of that mental disability cannot afford such a basis.

It may be that when the negligence of the defendant impairs the ability of a plaintiff to take the necessary measures to file a claim, fairness requires that we relax the rule.[2] That, however, is an issue for Congress. We cannot, as the dissent suggests, change the statute in order "to circumvent the obvious injustice of the result." Dissent op. at 997. Indeed, in *Zeleznik v. United States,* 770 F.2d 20, 24 (3d Cir. 1985), this court, applying *Kubrick,* noted that the two-year limitations period in the FTCA reflects Congress' determination of what is a reasonable time for injured parties to make a claim. We commented that "the statute of limitations is meant to be

---

**1.** Both the district court and plaintiff rely on the district court's opinion in *Greenberg v. McCabe,* 453 F.Supp. 765, 768 (E.D.Pa.1978), *aff'd,* 594 F.2d 854 (3d Cir.), *cert. denied,* 444 U.S. 840, 100 S.Ct. 78, 62 L.Ed.2d 51 (1979), where the court held that plaintiff's mental condition is a factor to be weighed in determining the time of discovery. *Greenberg* preceded the Supreme Court's decision in *Kubrick* which rejected use of a subjective factor.

**2.** All parties agree that this case is unlike the coma situation, *see, e.g., Washington v. United States,* 769 F.2d 1436, 1438–39 (9th Cir.1985), and *Clifford by Clifford v. United States,* 738 F.2d 977, 979–80 (8th Cir.1984), and hence we need not reach that issue. However, in light of the dissent's extensive reliance on these cases, we note that even in those cases the courts distinguished the extraordinary situation presented when plaintiff has been in a coma or has been lobotomized from a case such as this alleging some lesser level of mental incapacity. *See, e.g., Zeidler v. United States,* 601 F.2d 527, 531 (10th Cir.1979) ("We say also that brain damage or destruction is not to be classified in the same way as ordinary mental disease or insanity for the purpose of barring such an action"). *See also Dundon v. United States,* 559 F.Supp. 469, 474 (E.D.N.Y.1983). Although Judge Becker reads *Clifford by Clifford v. United States,* 738 F.2d 977 (8th Cir.1984), differently than do I, I note that *Clifford* quoted verbatim the language of *Dundon,* expressly interposing the reference to Allen Clifford and describing his "extraordinary situation." *Id.* at 980. The court in *Clifford,* as in the two cases cited above, distinguished Allen Clifford's situation from that of ordinary mental incapacity. *Id.*

applied in a uniform manner," and that the statute "does not guarantee that every injured party will necessarily be able to find and make a claim against a possibly responsible governmental agency." *Id.*

Because the only basis for the district court's failure to apply the FTCA's statute of limitations was Barren's mental incapacity, and that is an impermissible basis, I also vote to reverse the judgment for plaintiff entered by the district court.

BECKER, Circuit Judge, dissenting.

I have no disagreement with Judge Cowen or Judge Sloviter concerning the general rule governing the statute of limitations for medical malpractice under the *Kubrick* standard — the two year statute of limitations begins to run when a reasonable person should have known of the injury and its cause. Moreover, I freely concede that, generally speaking, the jurisprudence construing the statute of limitations under the Federal Tort Claims Act (FTCA) is not very pliable. The caselaw does not admit of tolling the limitations period by reason of infancy or mental disability or a number of other individualized traits that could reasonably interfere with the two events that, as I have noted, start the statute running: discovery of the injury and discovery of its cause. I part company with my colleagues, however, in their assessment that this is another in a line of sorry cases in which we have no power to circumvent the harsh dictates of the statute of limitations under the FTCA.

I believe that the majority has overstated and misapplied the *Kubrick* standard. I am persuaded that this case falls within a narrow, yet recognized equitable exception to the *Kubrick* general rule. Under this exception, the statute of limitations under the FTCA does not accrue for a plaintiff whose ability to perceive that the government injured him was destroyed by the government's negligent care until the plaintiff is affirmatively informed of the injury in a way he can understand, or until a guardian is appointed. The government concedes that Barren was unable to perceive his injury and that the government's negligent treatment of Barren aggravated his condition and contributed to that inability. And yet, in extending the *Kubrick* rule to the facts of this case, the majority has ignored two key factors that set Barren's case apart: 1) that this is an aggravation case where determining what a reasonable person would know is inherently very difficult; and 2) the government itself is responsible for Barren's inability to perceive his own mental deterioration.

I.

A. *Aggravation*

It is essential, at the threshold, to identify and discuss the precise nature of Barren's injury. His injury was the worsening of his mental condition caused by his negligent treatment by the VA, including its failure to diagnose his condition, misprescription of medication, counterproductive advice to Barren and his family, and failure to admit Barren for in-hospital observation and diagnosis.

Barren's mental illness began with his tour of duty in Korea. His mental problems became worse because, as the district court noted, "the defendant made no meaningful effort to diagnose Barren's condition or to treat it in the proper manner." J.A. at 51. Dr. Anghel, who was not board certified in psychiatry and was practicing for the first time without supervision, provided substandard care. Despite the pleas of Barren's mother and sister, Barren was fed a heavy diet of tranquilizers and peptalks, and was assured that he needed only to "grow up." Barren's medication was not monitored, and Dr. Anghel dismissed as "nonsense" many of Barren's serious subjective complaints (*e.g.*, anxiety, sleeplessness and crying fits).

Because the actual injury was the *further deterioration* of Barren's condition from mentally ill but nevertheless functioning, to totally incapacitated because of mental illness, the *Kubrick* standard is very difficult to apply. *See Augustine v. United States*, 704 F.2d 1074, 1078 (9th Cir.1983) ("[w]hen a physician's failure to diagnose, treat, or warn a patient results in the development of a more serious medical

problem than that which previously existed, identification of both the injury and its cause may be more difficult for a patient than if affirmative conduct by a doctor inflicts a new injury"); *Greenberg v. McCabe*, 453 F.Supp. 765, 772 (E.D.Pa. 1978), *aff'd without op.*, 594 F.2d 854 (3d Cir.), *cert. denied*, 444 U.S. 840, 100 S.Ct. 78, 62 L.Ed.2d 51 (1979) ("where the injury and cause thereof are subtler and more complicated than in the normal malpractice case, it seems particularly inappropriate to determine as a matter of law what the plaintiff should have known") (footnote omitted).

Judge Cowen makes much of the fact that Barren left the VA to seek outside help, and contends that this fact provides evidence that Barren knew or at least should have known of his injury and its cause. See maj. at 991. But the mere switching of physicians does not necessarily impute knowledge of injury and the source of that injury. *See Nicolazzo v. United States*, 786 F.2d 454 (1st Cir.1986) (distinguishing the facts of *Kubrick* and holding that plaintiff's awareness that VA physicians were not aiding him did not constitute knowledge of injury and its cause). Furthermore, in applying the *Kubrick* standard, Judge Cowen does not account at all for, the subtleties of an aggravation case. The notion that changing doctors does not necessarily establish discovery of negligence seems particularly true in an aggravation case, where the plaintiff already knows that he is sick and may not have any means for differentiating negligent care from the natural progression of the disease. Therefore, even under the rigid reasonable person standard that the majority adopts, I do not think it can confidently be said that Barren should have known of his injury.

## B. *The Government's Responsibility*

Second, and more important, I do not think the *Kubrick* standard should apply at all under the special facts of this case, where, as the majority opinion concedes, "the VA's malpractice was a substantial factor in Barren's inability to recognize that very malpractice." Maj. at 991. This case arrives to us in an unusual and compelling posture: because the district court held a trial on the merits before determining the statute of limitations questions, we are not dealing with alleged negligence but rather with *proven* negligence by the VA, which the government does not challenge on appeal. The district court accepted the plaintiff's argument "that John Barren was at all times during [the relevant] period unable to comprehend that his mental condition had deteriorated while he was under the care of the V.A. medical personnel and that the deterioration was caused by the treatment received at the hands of the V.A." J.A. at 29. There is thus no question that the poor care Barren received exacerbated his mental illness, directly contributed to his present mental incapacity, and most important, prevented him from understanding the nature or source of his injury.

Basic principles of equity dictate that the government cannot profit from its own negligence. At bottom my reasoning derives from the simple and compelling precept that the government cannot render someone unable to comprehend his injury and then impose a reasonable person discovery rule. The majority's emphasis upon the objective-subjective distinction in *Kubrick* is simply misplaced in this context. It ignores the added special factor of the government's participation in Barren's inability to comprehend his injury and its cause. In recognizing the unique and pernicious effect of the government's malpractice, we do no harm to the basic *Kubrick* discovery rule. Rather, we carve a narrow exception that prohibits the government from insulating itself from its own wrongful activity.

Barren's special situation strikes me as significantly distinguishable from mere mental incapacity which does not, in and of itself, toll the statute of limitations under the FTCA. The added factor here of the government's causation of that mental incapacity changes the rules of the game. I agree with Judge Bramwell in *Dundon v. United States*, 559 F.Supp. 469 (E.D.N.Y. 1983), where he considered the govern-

ment's argument based on a strict interpretation of the *Kubrick* rule and observed that

> [t]o treat this case as one involving mere mental incompetency in the general sense proffered by the government is to lose sight of the decedent's extraordinary situation. The decedent's mental condition, allegedly caused by his treating physicians, directly prevented his understanding the nature and cause of his injuries.

*Id.* at 474.

Other courts have managed to circumvent the obvious injustice of the result the lead opinion and concurrence reluctantly advance. Two lines of cases support the notion that where the government itself is responsible for the plaintiff's admitted inability to perceive the worsening of his condition, the suit will not be time barred. The first consists of coma cases, where the plaintiff's lack of consciousness is directly attributable to the government's negligence.[1] The second involves malpractice by therapists who violate the transference relationship by engaging in sexual relations with their patients thereby causing severe mental distress and aggravating a pre-existent mental illness. I discuss them in turn.

### 1. The Coma Cases

In *Clifford by Clifford v. United States*, 738 F.2d 977 (8th Cir.1984), a comatose patient represented by his guardian-father sued the United States for malpractice stemming from a drug overdose. The court held that the statute of limitations accrued when his father was appointed as guardian, and not, as the government contended, when the patient fell into the coma. Judge Arnold, speaking for the court, analogized Clifford's case to *Zeidler v.* *United States*, 601 F.2d 527 (10th Cir.1979), where the statute of limitations did not run for someone who was lobotomized by the government until a conservator was appointed on his behalf. As Judge Arnold explained, in both cases the government had "destroyed those plaintiffs' capacities to realize the existence and cause of their injuries." *Clifford*, 738 F.2d at 979. Essentially, the court in *Clifford* held that as a matter of fairness the statute of limitations must be tolled lest the government "profit from its own (alleged) wrong." *Id.* at 980. The court specifically held that because the patient had reached the age of majority and had not yet been declared legally incompetent, the knowledge of his family members could not be imputed to the patient himself. Furthermore, the court observed that tolling the statute of limitations in the case of a coma "does not disturb in any way [the] well-recognized rules" that ordinarily the statute of limitations is not tolled for infancy or mental incapacity and that its holding was fully consonant with *Kubrick. Id.* at 980.

Similarly, in *Washington v. United States*, 769 F.2d 1436 (9th Cir.1985), the court, citing *Clifford*, held that the cause of action accrued when the comatose plaintiff finally died, not when she entered her fourteen-year coma. The court reasoned that the plaintiff satisfied the rule because she was never aware of her injury or its cause. *Id.* at 1439. The court specifically held that the knowledge of plaintiff's husband was irrelevant to her ability to bring suit. *Id.* at 1438. *See also Dundon v. United States*, 559 F.Supp. 469 (E.D.N.Y. 1983) (tolling the statute of limitations for medical malpractice under the FTCA where government negligently sent plaintiff into a coma).[2]

---

1. Judge Sloviter in her concurrence correctly notes that the parties have agreed (as did the district court) that these coma cases do not apply. Barren, of course, was successful below and, I presume, did not wish to challenge on appeal the district court's reasoning, given that its decision was in his favor. However, the coma cases are before us both in the district court opinion and the government's brief. Because they materially enhance the analysis and discussion of this very troubling question, Barren's concessions cannot foreclose their consideration.

2. In her concurrence, Judge Sloviter contends that the coma cases themselves distinguished the extraordinary situation of a coma and lobotomy from some lesser level of mental incapacity. Concurring Op. at n. 2. I make two responses. First, the two cases upon which I rely most heavily, *Washington* and *Clifford*, make no such distinction. In particular, I disagree with

### 2. The Transference Cases

The second line of cases involves malpractice by a mental health therapist who by engaging in sexual relations violated the transference relationship with his patient.[3] In *Simmons v. United States*, 805 F.2d 1363 (9th Cir.1986), the Court of Appeals for the Ninth Circuit held that the statute of limitations had not run on a patient who sued her government sponsored counsellor for malpractice for wrongfully engaging her in sexual relations during the course of her treatment. The court held that the two year statute of limitations under the FTCA only began to run once she had been informed by another therapist that the source of her present injury (deep depression, attempted suicide) stemmed from her meretricious relationship with her former therapist. *Id.* at 1367. The court discussed the nature of the transference phenomenon at great length, explaining that given the special patient-therapist relationship, the court could not hold that the plaintiff reasonably should have known of her injuries any earlier. *Id.* The high degree of dependence and trust of the patient on her therapist, it was held, prevented a patient from understanding the nature of her injury or its cause.

In *Greenberg v. McCabe*, 453 F.Supp. 765 (E.D.Pa.1978), *aff'd without op.*, 594 F.2d 854 (3d Cir.), *cert. denied*, 444 U.S. 840, 100 S.Ct. 78, 62 L.Ed.2d 51 (1979), Judge Joseph S. Lord, III considered a similar question under Pennsylvania's law of psychiatric malpractice. Although this case preceded *Kubrick*, and is not an FTCA case, it applied the same standard as the *Kubrick* discovery rule. The court inquired into when the plaintiff, in exercise of reasonable diligence, should have discovered her injury and its cause. 453 F.Supp. at 768. It noted the deep dependence of the plaintiff on her therapist and the assurances by the therapist that their sexual encounters were part of her therapy. In rejecting defendant's motion for a judgment n.o.v., Judge Lord explained that the jury could have inferred that the extreme dependence of the plaintiff on her therapist and the therapist's improper behavior impeded the plaintiffs "powers of judgment" and that she "neither knew nor by objective standards could have known under those circumstances" the nature of her injury or its cause. *Id.* at 771–72. The court explained: "At issue is the objective effect of the defendant's [conduct] on discoverability by a reasonable person.... [T]he statutory period does not begin to run if ... the plaintiff's failure of discovery, objectively determined, is brought about by the very nature of the defendant's conduct." *Id.* at 769. *See also Person v. Kieffer*, 634 F.Supp. 892 (E.D.Pa.1986) (evidence that

Judge Sloviter's characterization of the *Clifford* case. Although it is true that the case takes note of Allen Clifford's "extraordinary situation," it seems clear to me that, in quoting the language of *Dundon*, the *Clifford* case perceives the "extraordinary situation" to be the government's causation of the plaintiff's inability to perceive his injury. The *Clifford* case explains:

> And, while mental incompetence generally does not toll the statute of limitations,
>
> > [t]o treat this case as one involving mere mental incompetence in the general sense proffered by the government is to lose sight of [Allen's] extraordinary situation. [His] mental condition, allegedly caused *by* his treating physicians, *directly prevented* his understanding the nature and cause of his injuries. *Dundon, supra*, 559 F.Supp. at 474. (Emphasis supplied).

*Clifford*, 738 F.2d at 980. This interpretation is bolstered by the fact that the *Clifford* case supplied the emphasis to this quote from *Dundon*, thereby focusing on the question of the government's causation.

Second, to the extent that *Zeidler* and *Dundon* do note their extraordinary facts, the reasoning derived from those cases is nevertheless directly on point where, as here, the government concedes that the plaintiff was unable to detect his mental deterioration because of the government's negligence.

**3.** As the court explained in *Simmons v. United States*, 805 F.2d 1363 (9th Cir.1986):

> Transference is the term used by psychiatrists and psychologists to denote a patient's emotional reaction to a therapist and is "generally applied to the projection of feelings, thoughts and wishes onto the analyst, who has come to represent some person from the patient's past."

*Id.* at 1364 (quoting Stedman's Medical Dictionary 1473 (5th Lawyers' Ed.1982)). When a therapist abuses the transference relationship and becomes sexually involved with a patient the result is as devastating psychologically as an incestuous relation. 805 F.2d at 1365.

attack by police dog may have caused psychological difficulties impeding plaintiff's memory tolled applicable two-year Pennsylvania tort statute for suits against police officers).

The nature of the relationship and the transference phenomenon blinded the patients in *Simmons* and *Greenberg* from comprehending the true nature of their injuries and its source. These cases are very similar to the coma cases in that the negligence itself (sleeping with a patient) was insulated from the patient's detection by the wrongdoer. Because of the special relationship, which the therapist abused, the patients did not question the wrongful activity or recognize it as the source of their injuries.

The government attempts to distinguish the transference cases. It claims that "Barren was never in a therapist-patient relationship with the VA's psychiatrist, and, therefore, the conditions for unquestioning trust were not present." Brief of Appellant at 21 n. 11. The government's attempted distinction misses the point. It essentially argues that Barren's case is distinguishable because he complains of too little psychiatric assistance, not too much. The analogy to the transference abuse cases does not derive from the fact that both cases involve therapists, but rather that both cases involve wrongdoers who are insulated from suit because the patient cannot reasonably be expected to understand the nature or the source of his or her injuries. In the case of transference abuse, the therapist shields himself from the patient's discovery of the wrong by taking advantage of the special, dependent relationship to cover up the injury he is inflicting. The therapist assures the patient that the sexual encounter is an important part of the therapy thus insulating his harmful conduct from detection as the source of the patient's worsened mental health. In Barren's case, the progression of Barren's mental illness under Dr. An-

ghel's care prevented Barren from discovering his injury.

### 3. Barren's Case

I have discussed the above precedents in detail to demonstrate that my objection to the holding in this case stems from more than personal distaste for the obvious unfairness of the result, a sentiment shared by the majority. I find no principled way to distinguish Barren's case from the cases discussed above. In both lines of cases the plaintiff is unable to detect the injury and its source through no omission of his own, but rather because of the malfeasance of the wrongdoer himself. Admittedly, a coma seems more dramatic, and perhaps is easier to understand. I must stress, however, that Barren's case is analytically no different. Clear, unchallenged evidence indicates that, because of the government's negligence, Barren was unable to perceive the worsening of his mental condition. For the purposes of recognizing his injury, he was akin to a comatose patient (*Clifford, Washington*), or a patient whose therapist has violated the transference relationship (*Simmons, Greenberg*).

The government claims that the rule I espouse is "unworkable as a practical matter," because it "does not indicate how long accrual should be delayed." Appellant's Br. at 22. I have four responses to the concern that this narrow rule might engender a case with no foreseeable statutory time limit.[4] First, this is obviously a narrow rule. In adding Barren's case to the short list of situations, like comas and transference abuse, where the patient cannot reasonably be expected to discover the injury and its cause because of the very negligence, we do not open the courthouse doors to a floodgate of stale claims. *See Dundon*, 559 F.Supp. 469, 475 ("[t]he exception is narrow and merely prevents 'blameless ignorance' from being penalized, by avoiding the anomalous result of having an arguably wronged comatose patient de-

---

**4.** Additionally, I note that the very nature of the *Kubrick* discovery rule indicates that in some cases the government will have to wait a long time after its original tort before it is sued. Furthermore, other factors, such as continuous treatment, often result in the *de facto* tolling of the limitations period. *See, e.g., Otto v. National Institute of Health*, 815 F.2d 985 (4th Cir. 1987).

nied his right to press a claim by virtue of the very malpractice of which he seeks to complain").

Second, as other courts that have considered this same question have observed, the passage of time handicaps the interests of both sides, and a plaintiff who brings suit after too long a period will have trouble adducing evidence and proving his claim. For example, the Ninth Circuit noted in *Washington* that "[t]he [plaintiffs], as well as the government, share this increased burden caused by the passage of time, and the [plaintiffs] should not be prevented from maintaining this action when the government was responsible for the condition which caused the delay." 769 F.2d at 1439 (citations omitted). Similarly, Judge Arnold noted that

> [t]he government's best argument is that the rule advocated by plaintiff might leave it open to suit indefinitely. No doubt that is true, at least in theory.... Probably the real exposure of the government to liability would be slight in such cases, though. The passage of time should make it progressively more difficult for plaintiff to prove his case.

*Clifford,* 738 F.2d at 980.

Third, anyone conducting the balance in this case would at once note that the government would not have to wait for the claim to accrue for years on end. At the very latest, the statute of limitations would have begun to run when John Barren was deemed mentally incompetent and his sister was appointed as guardian. *See Clifford,* 738 F.2d at 980 (statute of limitations did not begin to run until guardian was appointed); *Zeidler v. United States,* 601 F.2d 527 (10th Cir.1979) (statute of limitations did not begin to run until conservator appointed). I believe that the doctrine of laches can be relied upon to balance the rights of the plaintiff against the need of the government to know when it will be sued. Laches has historically been an effective barrier to such claims not subject, for one reason or another, to a statutory time bar. Here the doctrine of laches would not appear to bar the plaintiff's claim.

Finally, and most important, even if we find that the government would be exposed to additional liability, I believe we must balance the harm to the government against the intolerable effect of the majority's holding, which allows the government to benefit from its own negligence. *See Clifford,* 738 F.2d at 980 ("[W]e are persuaded that the rule contended for by the government would be still more objectionable. For under it the government would profit from its own (alleged) wrong.").

At bottom, I believe that the *Kubrick* rule simply cannot apply to this case. As I have stressed above, I advocate an exception to that rule not because of Barren's mental incompetency *simpliciter,* but because of the government's conceded participation in Barren's inability to perceive his injury. Judges Cowen and Sloviter emphasize that the test cannot be subjective. For this proposition they recite black letter law, but they cite no cases that deal with the unusual circumstances of this case. Nor do they directly confront the coma or transference lines of cases. In sum, I find the *Kubrick* rule tragically inappropriate under the circumstances. Instead, I advocate following the wise jurisprudence of courts that have carved a narrow equitable exception to the reasonable person standard of *Kubrick* where the government itself has fostered the plaintiff's incapacity to comprehend the nature and source of his injury.[5]

## II.

Finally, in view of my conclusion above, I address the question that the majority and concurrence do not reach concerning the

---

**5.** Judge Sloviter suggests that the position I advocate would "change the statute." Concurring Op. at 994. I disagree. The statute requires that "[a] tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues." 28 U.S.C. § 2401(b). The determination of when a medical malpractice claim accrues, however, is an inherently judicial inquiry. As discussed above, other courts of appeals have not found themselves to be powerless in circumstances analogous to Barren's case, and for the reasons I have set forth I think we should follow their lead.

Pennsylvania immunity statutes. *See* maj. at 992 n. 8. I find these to be vexing questions and I hesitate to pronounce on them here in the depth that otherwise would be justified given my dissenting posture. Nevertheless, at least to indicate that my vigorous opposition to the holding of this case is not a vain exercise, I will explain briefly why I do not believe that the government is entitled to full immunity under the Pennsylvania statutes.

The government argues that it is entitled to all immunity available to any individual or government body. For this proposition it cites *General Electric Co. v. United States,* 813 F.2d 1273 (4th Cir.1987), *vacated on other grounds,* — U.S. ——, 108 S.Ct. 743, 98 L.Ed.2d 756 (1988), holding the United States immune from tort suit because a Maryland employer would be immune from tort suit under Maryland's workers' compensation law. Proceeding from this premise, the government claims immunity pursuant to 50 Pa.Stat. § 4603, which was effective when Dr. Anghel negligently treated Barren but was repealed in 1976.[6] The statute provides that

> No person and no governmental or recognized nonprofit health or welfare organization or agency shall be held civilly or criminally liable for any diagnosis, opinion, report or any thing done pursuant to the provisions of this act if he acted in good faith and not falsely, corruptly, maliciously or without reasonable cause; provided, however, that causes of action based upon gross negligence or incompetence shall not be affected by the immunities granted by this section.

Mental Health and Mental Retardation Act of 1966, § 603, 50 Pa.Stat. § 4603 (1969), *repealed by* 1978 P.L. 1399 No. 330, § 802.

I note that two courts in Pennsylvania have held that this provision applies only to protect *admission* decisions. *See Saunders v. Latrobe Area Hospital, Inc.,* 14 Pa.

D. & C. 3d 458, 461–62 (Arbitration Panel for Health Care), *permission to appeal denied,* 14 Pa. D. & C. 3d 466 (Pa.Commw. 1980); *Hanczar v. Trellis,* 14 Pa. D. & C. 3d 466, 468–69 (Arbitration Panel for Health Care), *permission to appeal denied,* 14 Pa. D. & C. 3d 470 (Pa.Commw. 1980). It seems likely to me that the Supreme Court of Pennsylvania would similarly decide that the statute applies only to admission decisions. The statute would not, therefore, insulate the negligent treatment of Dr. Anghel (*e.g.,* improper drug dispensation, detrimental advice), though it would protect the failure to admit Barren for in-hospital psychological evaluation.

For the reasons set forth in Part I, I would affirm the district court's holding on the statute of limitations question. For the reasons briefly set forth in this section, I would remand for the district court to decide two matters. First, I believe that the district court should consider the question whether Dr. Anghel's treatment rose to the level of gross negligence or incompetence, as alleged in Barren's complaint. It is clear from the language of the statute that if Dr. Anghel committed gross negligence, or was deemed incompetent, the statute would not bar recovery at all. *See Freach v. Commonwealth,* 471 Pa. 558, 370 A.2d 1163 (1977). Second, under my view, even if the statute applies, the district court must recalculate the damage award. I believe that under Pennsylvania law Barren is entitled to receive at least some of his award—that attributable to the negligent care he received—even if the district court ultimately must reduce the damages to immunize the government from its negligence in failing to admit Barren for observation and diagnosis.

I respectfully dissent.

---

**6.** The government also claims immunity pursuant to 50 Pa.Stat.Ann. § 7114 (Purdon Supp. 1978). However, I discuss only the first statute because I believe the second one, 50 Pa.Stat. § 7114, does not apply. Section 7114 was passed after the negligence in this case had already occurred. *See* 1 Pa. Const.Stat.Ann. § 1926 (Purdon Supp.1987) (effective 1972)

("No statute shall [be] construed to be retroactive unless clearly and manifestly so intended by the General Assembly."). *See Hanczar v. Trellis,* 14 Pa. D. & C. 3d 466, 468 (Arbitration Panel for Health Care), *permission to appeal denied,* 14 Pa. D. & C. 3d 470 (Pa. Commw. 1980).