

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-31-2006

# Green v. USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-1298

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Green v. USA" (2006). *2006 Decisions.* Paper 1354.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1354

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No.  05-1298
_____

WALTER GREEN;
JESSIE GREEN, his wife

v.

UNITED STATES OF AMERICA,
c/o VETERANS AFFAIRS MEDICAL
CENTER UNIVERSITY AND WOODLAND AVE.;
DR. ROBERT H. FITZGERALD, c/o
UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM

Walter Green and Jessie Green,
Appellants

_____

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 03-cv-00804)
District Judge: Honorable Robert B. Kugler

_____

Submitted Under Third Circuit LAR 34.1(a)
November 18, 2005

Before: BARRY, and AMBRO, <u>Circuit Judges</u>
POLLAK*, <u>District Judge</u>

(Filed: March 31, 2006)

_____

*Honorable Louis H. Pollak, United States District Judge for the Eastern District
of Pennsylvania, sitting by designation.

OPINION OF THE COURT

AMBRO, Circuit Judge

We have before us whether the District Court properly held that Walter Green's cause of action was barred by the statute of limitations under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2401(b). Because our decision in *Hughes v. United States*, 263 F.3d 272, 275 (3d Cir. 2001), answers this inquiry in the negative, we reverse and remand this case to the District Court.

## I. Factual and Procedural Background

On December 2, 1997, Green underwent a total hip replacment. The surgery was performed by Dr. Robert Fitzgerald at the Veterans Affairs Medical Center (VA) in Philadelphia, Pennsylvania. When Green awoke from surgery the following morning, he was in considerable post-operative pain and discovered that one of his legs was shorter than the other. On the evening of December 3, 1997, Green felt his hip become unstable when he was using the bathroom. Two or three days later, his hip dislocated, causing considerable pain. Green was medicated and his hip prosthesis was relocated to the proper position. Thereafter, Green was prescribed a hip brace designed to provide additional stability to his hip in order to prevent any further episodes of dislocation.

After his discharge from the hospital, Green underwent a course of physical

therapy. During several post-operative visits at the VA with his internist, Green complained of pain, partial occasional dislocation of his hip, and a recurring clicking noise in his hip that occurred throughout the day.[1] Green testified that he was informed each time he appeared at the VA that his symptoms were normal, expected, and ultimately would improve.

The VA medical records support Green's testimony. For instance, a VA progress note dated February 3, 1999, stated that Green was complaining of his left hip clicking. The note indicates that x-rays were performed and states "well fixed components retroverted acetabular components." No further action was recommended and Green was never informed that there was any problem with his prosthesis. On October 4, 1999, two years prior to the filing of his administrative claim, Green visited the VA clinic where it was noted that his left hip had a normal post-operative appearance. Green's final visit with the VA occurred on January 29, 2001. The progress note from that date again indicates that Green's total hip arthroplasty had a "normal post-operative appearance."

Green testified that the doctors he saw outside of the VA in 1998-99 also told him that his symptoms were normal and would improve. His medical records indicate that he received extensive medical care outside the VA. Indeed, he was treated by his primary care physician, Dr. Jeffrey Oppenheim, on May 18, 1998, April 16, 1999, September 9,

---

[1]Green's medical records indicate that he returned to the VA for checkups on February 3, 1999, October 4, 1999, and January 29, 2001.

1999, April 17, 2000, August 28, 2000, September 28, 2000, February 12, 2001, March 19, 2001, April 30, 2001, and June 4, 2001.

Green testified as well that he learned to live with the clicking sound in his hip until the situation worsened to the point where he decided to seek another opinion. Dr. Oppenheim referred Green for an orthopedic evaluation with Dr. Berman, a non-VA doctor. On March 31, 2001, Dr. Berman ordered x-rays that demonstrated "excessive anteversion of the acetabular component[,] which is the cause of the dislocation." Dr. Berman's diagnosis was "malposition of the left acetabular component, total hip replacement."

On June 1, 2001, Green was seen by Dr. Scott Schoifet, another non-VA doctor, for an orthopedic evaluation of his left hip dislocation problem. Dr. Schoifet noticed that Green's left hip x-rays showed "45 degrees of retroversion of the acetabulum," the clear cause of Green's recurrent dislocations. Because Green needed a revision of the acetabular component, Dr. Schoifet referred him to the Hospital of the University of Pennsylvania (HUP). Green emphasizes that this was the first time he was informed of the retroversion and malpositioning of the prosthesis.

On September 4, 2001, Green was evaluated by Dr. Christopher Born, an orthopedic surgeon at HUP. It was Dr. Born's medical opinion that Green's x-rays performed in 1999 at the VA demonstrated that the acetabular component was placed at about forty degrees of retroversion. On October 8, 2001, Dr. William DeLong, Jr. (Dr.

Born's partner) stated that Green's more recent x-rays also showed the marked retroversion. As a result of the improper location of the prosthesis, Green required revision of his left hip replacement. Dr. DeLong performed the revision on December 20, 2001.

Green filed an administrative claim with the Veterans Affairs Medical Center on October 2, 2001, which was denied. On February 24, 2003, Green proceeded with this FTCA suit in the United States District Court for the District of New Jersey, alleging that the total hip replacement he received at the VA hospital in 1997 was negligently performed. The Government moved for summary judgment, arguing that Green's action was barred by 28 U.S.C. § 2401(b), under which tort claims against the United States are barred unless presented in writing to the appropriate agency "within two years after such claim accrues." Because Green had filed an administrative claim on October 2, 2001, the District Court was tasked with determining whether Green's FTCA claim "accrued" within the meaning of that statute before October 2, 1999. Because it found that Green's FTCA claim accrued at the latest on or before February 8, 1999, the District Court ruled that Green's action was time-barred under § 2401(b). This appeal followed.[2]

**II. Standard of Review**

We exercise plenary review over a district court's grant of summary judgment and

---

[2]Because the defendant here is the United States, the District Court had jurisdiction pursuant to 28 U.S.C. § 1346(b)(1). Because this is an appeal from the grant of summary judgment by the District Court, we have jurisdiction pursuant to 28 U.S.C. § 1291.

apply the same standard as the District Court, *i.e.*, whether there are any genuine issues of material fact such that a reasonable jury could return a verdict for the plaintiffs. Fed. R. Civ. P. 56(c). We are required to "view the record and draw inferences in a light most favorable to the non-moving party." *In re IKON Office Solutions, Inc.*, 277 F.3d 658, 666 (3d Cir. 2002).

### III. Discussion

Statutes of limitations "are found and approved in all systems of enlightened jurisprudence." *Wood v. Carpenter*, 101 U.S. 135, 139 (1879). Although they provide what legislatures consider a reasonable period for plaintiffs to present their claims, "they protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence." *United States v. Kubrick*, 444 U.S. 111, 117 (1979). In enacting the FTCA, Congress waived the immunity of the United States. A condition of that waiver is that suits be filed within a prescribed time. As noted above, under § 2401(b), "a tort claim against the United States is barred unless it is presented in writing to the appropriate federal agency 'within two years after such claim accrues.'" *Kubrick*, 444 U.S. at 113 (quoting § 2401(b)).

The time at which a claim "accrues" within the meaning of the FTCA is a matter of federal law. *See Ciccarone v. United States*, 486 F.2d 253, 256 (3d Cir. 1973). In a medical malpractice action under the FTCA, an accrual occurs when "the putative plaintiff possesses facts which would enable 'a reasonable person to discover the alleged

6

malpractice.'" *Hughes v. United States*, 263 F.3d 272, 275 (3d Cir. 2001) (quoting *Barren by Barren v. United States*, 839 F.2d 987, 991 (3d Cir. 1988)). A plaintiff possesses those facts where he or she knows, or where an objectively reasonable person through the exercise of reasonable diligence should have known, of both the fact of the injury and its cause. *Hughes*, 263 F.3d at 278; *Barren*, 839 F.2d at 991; *see also Kubrick*, 444 U.S. at 123 (holding that accrual does not require a plaintiff's awareness that his injury was negligently inflicted). Therefore, the determination of the time at which a claim accrues within the meaning of § 2401(b) involves an objective inquiry: asking not what the plaintiff actually knew, but what a reasonable person should have known. *See Barren*, 839 F.2d at 990.

For tort actions, the general rule is that the cause of action accrues at the time of the last event necessary to complete the tort. Usually, this is at the time the putative plaintiff is injured. *Kubrick*, 444 U.S. at 120. An injured party, however, cannot make a claim until he knows or should know that he had an action to bring. Thus, the Supreme Court has held that an injured party's cause of action does not accrue until he learns of his injury. *Urie v. Thompson*, 337 U.S. 163 (1949). In most cases, when a person learns of his injury, he is on notice that there has been an invasion of his legal rights, and that he should determine whether another may be liable to him.

However, in some circumstances, a person may know that he has been injured but not be sufficiently apprised by the mere fact of injury to understand its cause. *Cf.*

7

*McGowan v. University of Scranton*, 759 F.2d 287 (3d Cir. 1985) (statute of limitations does not accrue until a plaintiff learns of the cause of injury when she died of toxic shock syndrome at a time when the cause of toxic shock syndrome had not been discovered by medical science). In those circumstances, when the fact of injury alone is insufficient to put an injured party on notice of its cause, the Supreme Court has indicated that the accrual of the claim is delayed until the injured party discovers that cause. *Kubrick*, 444 U.S. at 122.

As can be gathered from what we cite above, the leading case construing accrual of an injury under § 2401(b) is *Kubrick*. There, the Supreme Court held that an FTCA malpractice claim accrued when the plaintiff learned from a consultant that his deafness "probably resulted" from neomycin treatment and not at a later time, when the plaintiff learned that neomycin treatment constituted malpractice. *Kubrick*, 444 U.S. at 115. Disclosure of the probable cause of the injury in *Kubrick* implicated the treating physician, but the Supreme Court rejected the notion that claim accrual awaits a consultant's opinion that the harm is iatrogenic (physician-caused).[3] *Id*. at 122. Indeed, *Kubrick* dictates that a malpractice claim accrues when a patient knows the physical cause of a bad result, even without confirmation that the injury was the result of malpractice. *Id*. The Court reasoned that, once the plaintiff knows "the critical facts that

_____

[3]Iatrogenic is a term that "applies to any adverse condition in a patient occurring as a result of treatment by a physician or surgeon, especially to infections incurred by the patient during the course of his treatment." *Hughes*, 263 F.3d at 277 n.2.

he has been hurt and who has inflicted the injury," he can seek medical and legal advice to determine whether the medical care he received was substandard and whether he has a viable cause of action for negligence. *Id*.

Following the Supreme Court's holding in *Kubrick*, our Court generally requires plaintiffs to bring claims within two years of accrual of a FTCA cause of action. However, we have made a distinction between affirmative, albeit negligent, treatment, as in *Kubrick*, and injuries that are the result of the failure to diagnose or treat a claim. *See Hughes*, 263 F.3d at 276-77. In *Hughes*, the plaintiff was admitted to a VA hospital on April 15, 1997, for a cardiac catheterization and coronary bypass surgery. *Id*. at 273-74. Heparin, a blood thinner, was administered almost continuously from April 16 through April 23. *Id*. at 274. Following the surgery, Hughes developed gangrene in all four extremities, and they were later amputated. *Id*. Due to complications resulting from heavy sedation, he did not awake until June 4, 1997, at which time the VA physicians told him that he had suffered an allergic reaction to heparin, which caused the gangrene and left the doctors no choice but to amputate. *Id*. Hughes was not informed that had his allergic reaction been timely diagnosed, it could have been treated and cured with anticoagulants. *Id*. Hughes first consulted with an attorney in April 1999. His medical records were requested in May 1999 and received in June 1999. After a change in counsel in December 1999, Hughes filed an administrative claim on July 6, 2000. *Id*.

Applying *Kubrick* to the facts before it, the District Court found that Hughes

9

became aware of his injuries (the amputations) when he awoke from his coma. *Id.* at 276. It also found that Hughes learned the cause of his injury while still in the hospital, when his physician informed him that he had an allergic reaction to the heparin which ultimately necessitated his amputations. *Id.* Concluding that this information would have led a reasonable person to suspect malpractice, the District Court held that, once he was in possession of these facts, *Kubrick* charged Hughes with a duty to investigate promptly his claim or risk losing it. *Id.*

We reversed, ruling that the statute of limitations was not activated by Hughes' awareness of his injury, but was tolled until he became aware of the act that caused his injury. *Id.* at 276-77. The administration of heparin was not the cause of the injury; rather it was the failure of the VA physicians to treat Hughes timely with an anticoagulant. *Id.* Moreover, our Court rejected the District Court's belief that Hughes' "reliance on his doctors' assurances that, because of his previously unknown allergy the amputations were unavoidable," was sufficient to make him aware "not only of his injury but also its cause." We stated in response:

> [Hughes] was not provided any information that should have led him to believe that it was the failure to treat timely the allergic reaction to the heparin that caused the formation of gangrene. On the contrary, he was led to believe that the formation of the gangrene was a natural, albeit unexpected, allergic reaction to the heparin dosage.

*Id.* at 276.

Green maintains that, similar to the plaintiff in *Hughes*, he had "absolutely no

reason to suspect an iatrogenic cause of his injury in light of reassurances by the VA doctors that the post-operative x-rays of his hip were normal." Appellant's Br. at 16. Rather, he "was led to believe that hip dislocations and associated discomfort were a natural consequence of the surgery rather than a failure of the VA doctors to recognize and correct the malposition of the acetabular component of the prosthesis." *Id.* Relying on *Kubrick*, and without reference to *Hughes*, the District Court rejected Green's argument.

The Court first stated that because Green filed his administrative claim on October 2, 2001, his action was barred by § 2401(b) so long as the Government established that he knew, or through the exercise of reasonable diligence should have known, of both the fact of the injury (the retroverted acetabular component of the hip prosthesis) and its cause (the allegedly improper insertion of the component into his hip on December 2, 1997) before October 2, 1999. The Court then noted that Green himself testified that his symptoms (pain, clicking, partial dislocation, and leg length discrepancy) were present upon his post-surgery discharge from the VA hospital in December 1997, and continued until or beyond his second hip surgery in December 2001. Therefore, the Court reasoned, it was clear the Green's injury manifested itself well before October 2, 1999. The District Court went on to point out that Green also argued that the retroverted acetabular component was readily detectable before that date. As a result, it concluded that an objectively reasonable person exercising reasonable diligence should have known

before October 2, 1999, that the hip prosthesis had been improperly inserted. Moreover, the Court emphasized that Green's medical records, which reveal that he complained of hip problems to doctors outside the VA prior to October 2, 1999, belie his argument that he relied on the opinions of the VA doctors that his x-rays looked normal and that no further treatment was needed.

On appeal, Green counters by arguing that, although he did complain to doctors outside the VA about his hip in 1998 and 1999, his complaints did not lead to the performance of x-rays at that time. Because it is undisputed that "the only way to discover the degree of retroversion of the component parts of the prosthesis is by diagnostic imagining techniques," Green asserts that his visits outside the VA prior to October 2, 1999, did not belie the VA doctor's opinions that his x-rays and symptoms were normal. We agree.

Similar to the plaintiff in *Hughes*, Green had no reason to suspect an iatrogenic cause of his injury in light of reassurances by the VA doctors that the post-operative x-rays of his hip were normal. Rather, he was led to believe that the dislocations of his hip and associated pain were a consequence of the surgery rather than a failure of his doctors to recognize and correct the improperly positioned prosthesis. Indeed, when distilled under the *Hughes* analysis, Green's claim has as much, if not more, force than did Hughes' claim. Hughes emerged from heart surgery with no limbs, a result his doctors blamed on a gangrene reaction to heparin administration. Any doctor could have told

12

Hughes that such a result was easily treatable by anticoagulant administration and, as such, the failure to do so in lieu of amputation was a clear-cut case of medical malpractice. Green, on the other hand, emerged from hip surgery with hip pain and displacement, a result his doctors characterized as normal under the circumstances. There is no dispute that discovery of the underlying cause of Green's injury – a misplaced prosthesis – requires a specific and specialized inquiry; that is, an orthopedic evaluation including x-ray interpretation. Thus, the negligence of Green's doctors was not as apparent as the negligence of Hughes' doctors.

As we made clear in *Hughes*,

[w]here a claim of medical malpractice is based on the failure to diagnose or treat a pre-existing condition, the injury is not the mere undetected existence of the medical problem at the time the physician failed to diagnose or treat the patient or the mere continuance of that same undiagnosed problem in substantially the same state. Rather, the injury is the development of the problem into a more serious condition which poses greater danger to the patient or which requires more extensive treatment. In this type of case, it is only when the patient becomes aware or through the exercise of reasonable diligence should have become aware of the development of a pre-existing problem into a more serious condition that his cause of action can be said to have accrued for purposes of section 2401(b).[4]

_____

[4]The *Kubrick/Hughes* line of cases demand that medical malpractice plaintiffs exercise reasonable diligence to be on notice of both the fact of any injury and its cause—and, once on notice, to file their claims promptly. Thus, one could argue here that Green failed to exercise reasonable diligence to be on notice of the fact of his injury. That argument is unpersuasive here where we are presented with a plaintiff who (1) experienced pain, discomfort and associated symptoms after a hip replacement surgery, (2) repeatedly reported the pain and symptoms to his treating physicians, and (3) was told over and over again that the pain and symptoms were nothing more than part of the surgical healing process. Green's persistent presentation of his perceived problematic symptoms to medical experts satisfies the reasonable diligence requirement. If not, what could Green

13

263 F.3d at 278. In other words – and viewing the evidence in the light most favorable to Green – his cause of action accrued when he became aware in June 2001 that his VA orthopedist had misplaced the hip prosthesis. It is undisputed that Green filed his administrative claim on October 2, 2001. Accordingly, Green's claim was timely filed under the two-year limitations period mandated by the FTCA.

## IV. Conclusion

For the reasons detailed above, the order of the District Court dismissing the case is reversed and the case remanded for further proceedings not inconsistent with this opinion.

---

have done that would satisfy that requirement? (In *Kubrick*, the Supreme Court expressly states that the plaintiff did not exercise reasonable diligence because he made <u>no inquiry whatsoever</u>. *See Kubrick*, 444 U.S. at 123 (stating "[t]he difficulty is that it does not appear that Kubrick ever made any inquiry, although meanwhile he had consulted several specialists about his loss of hearing . . .")). It makes little sense to imply that *Kubrick* stands for the proposition that a plaintiff who believes that he has a medical injury—but has been consistently informed by medical experts that he does not—should just go ahead and sue "just in case" those experts are wrong without any evidence to support his malpractice claim.

14