**Tanya Nicole KACH a/k/a Nikki Diane Allen**

v.

**Thomas HOSE, individually and on behalf of both St. Moritz Security Services, Inc. and McKeesport School District; \*St. Moritz Security Services, Inc., a Pennsylvania Corporation, and on behalf of the McKeesport School District; McKeesport School District; McKeesport School Board; Dr. Robert Weinfurtner, Superintendent; The City of McKeesport; Eleanor Hose and Howard Hose, as Husband and Wife; E. Michael Elias, Juvenile Lieutenant, McKeesport Police; Dan Pacella, Vice–Principal McKeesport School**

District; Andrea Abrams, Acting–Principal McKeesport School District; Tom Carter, Both Chief, McKeesport Police, and McKeesport School Board Member; Judy Sokol and Debbie Burnette Tanya Nicole Kach, Appellant.

(*Dismissed per Court Order dated 8/18/09).

No. 08–3921.

United States Court of Appeals, Third Circuit.

Argued Oct. 29, 2009.

Filed: Dec. 23, 2009.

Lawrence H. Fisher, (Argued), Cohen & Willwerth, Pittsburgh, PA, Attorney for Appellant.

P. Brennan Hart, Jeanette H. Ho, (Argued), Pietragallo, Gordon, Alfano, Bosick & Raspanti, Pittsburgh, PA, Attorneys for City of McKeesport, E. Michael Elias and Tom Carter.

David S. Bloom, Ronald R. Lucas, Jr., (Argued), Maiello, Brungo & Maiello, Pittsburgh, PA, John F. Cambest, Dodaro, Kennedy & Cambest, Pittsburgh, PA, Attorneys for Tom Carter, Andrea Abrams, Debbie Burnette, McKeesport School Board, McKeesport School District, Dan Pacella and Robert Weinfurtner.

Before: SMITH, FISHER and NYGAARD, Circuit Judges.

OPINION OF THE COURT

FISHER, Circuit Judge.

This case arises from a highly unusual and extremely disturbing set of circumstances. In September 1995, Tanya Nicole Kach was a fourteen-year-old student when she befriended, and later became intimate with, Thomas Hose, a security guard at her middle school. Several months later, Kach ran away from home and spent the next approximately ten years living clandestinely with Hose. In March 2006, when in her twenties, Kach disclosed her true identity to a friend and was removed by law enforcement authorities from Hose's house. Thereafter, she brought this lawsuit against Hose, several other individuals as well as school and law enforcement officials, asserting various 42

U.S.C. § 1983 [1] and state-law claims. The District Court dismissed all of Kach's claims at summary judgment. The Court determined that most of Kach's § 1983 claims and certain state-law claims were time-barred and that Hose had not acted under color of state law for § 1983 purposes. Having disposed of Kach's federal claims, the District Court declined to exercise supplemental jurisdiction over her remaining state-law claims. Kach now appeals. We will affirm the District Court's ruling in its entirety.

## I.

### A.

Kach [2] was born on October 14, 1981 to Jerald and Sherri Kach.[3] She spent the first several years of her life in Monongahela, Pennsylvania. In April 1995, Jerald Kach met Jo–Ann McGuire. Several months later, following Jerald and Sherri Kach's separation, Jerald and Tanya Kach moved in with McGuire and her son at their home in McKeesport, Pennsylvania.

In September 1995, Kach began attending Cornell Middle School in McKeesport. A few weeks after starting school, Kach met Hose, a security guard working at Cornell and employed by St. Moritz Security Services, Inc. St. Moritz, a private security firm under contract with the school, had hired Hose in August 1994 and shortly thereafter assigned him to Cornell, where he was responsible for monitoring the premises and breaking up fights among students. After their initial encounter, Kach developed a crush on Hose and began writing him letters expressing her feelings for him. As the school year progressed, the relationship between Kach and Hose grew intimate. Hose sometimes removed Kach from class, ostensibly for disciplinary reasons but in reality for the purpose of spending time with her alone. Hose also gave Kach gifts in the form of money and jewelry. The two often walked the halls of Cornell together and occasionally met at a prearranged location underneath a stairwell. At Hose's invitation, Kach spent Superbowl Sunday in 1996 at Hose's house in McKeesport, where Hose lived with his parents, Eleanor and Howard, and his son. Hose's family was not at home during Kach's visit. Kach ended up spending the night and "making out" with Hose. Hose told Kach on a number of occasions that he understood that her home life was unstable and that he could take better care of her than her parents could.

On February 9, 1996, Kach packed some possessions into a book bag. The next day, she left home without telling anyone and went to Hose's house with the belief that her life would be better with Hose. Four days after Kach's departure and with no knowledge of her whereabouts, Jerald Kach reported his daughter missing to the McKeesport Police Department. A miss-

---

1. Section 1983 provides in part:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983.

2. Unless otherwise indicated, any reference to Kach means the plaintiff-appellant in this case.

3. Because this is an appeal from the grant of summary judgment, we view the evidence in a light most favorable to Kach, the nonmoving party. *See Fagan v. City of Vineland*, 22 F.3d 1296, 1299 (3d Cir.1994) (en banc).

ing persons report was issued and an officer was dispatched to Hose's home during the course of the ensuing investigation. During the officer's visit, Kach stayed in hiding and her presence went undiscovered.

Kach spent the next approximately ten years living with Hose, unbeknownst at first to everyone but the two of them. For the first several years, Kach remained in Hose's bedroom for long stretches of time, locking the door from the inside during Hose's absences and opening it only on Hose's return.[4] Beginning in 2000, with Hose's assent, Kach occasionally left the house while Hose's parents were not at home but always returned before they did.[5] Kach sometimes took the bus to go shopping or ventured around the neighborhood on foot. Although Kach at various times had misgivings about her living conditions, she remained with Hose. Her occasional complaints to Hose about wanting to leave were met with threats and "guilt trips."

In June 2005, Hose introduced Kach to his parents. Thereafter, Kach's unaccompanied outings became increasingly common. During the course of her excursions, Kach met Joseph Sparico, the owner of a local convenience store to whom she introduced herself as Nikki Diane Allen. She made frequent visits to the convenience store, in time befriending Sparico and his family. In March 2006, Kach informed Sparico that she was in fact Tanya Kach and that she had been living with Hose for ten years. Law enforcement authorities were notified, ultimately leading to Kach's removal from the house and Hose's arrest and conviction for various criminal offenses arising out of his relationship with Kach.

## B.

In September 2006, approximately six months after her identity and whereabouts came to light, Kach initiated this lawsuit in the United States District Court for the Western District of Pennsylvania, asserting § 1983 and state-law claims arising out of her association with Hose. She named as defendants Hose and his parents; St. Moritz; the McKeesport Area School District [6] and its superintendent, Dr. Robert Weinfurtner; the McKeesport School Board; Dan Pacella, a Cornell administrative assistant; Andrea Abrams, Cornell's acting principal; the City of McKeesport; E. Michael Elias, a lieutenant with the McKeesport Police Department Juvenile Bureau; Thomas Carter, the McKeesport Police Department chief of police and a member of the McKeesport School Board; and Judy Sokol, one of Hose's friends who was alleged to have aided Hose in concealing Kach's identity. The Clerk of the District Court entered default against Eleanor and Howard Hose as well as Sokol after all three failed to plead or otherwise defend within the time required by law. The District Court thereafter denied Kach's motion for the entry of default judgment against those defendants.

In July 2007, Kach filed an amended complaint against the same defendants listed above plus Debbie Burnett, a Cornell guidance counselor. In Count Two of

---

4. The door to Hose's bedroom could be locked only from the inside; it did not have an outside lock.

5. Although Hose's parents lived in the same house as Kach for the entirety of her time there, they were unaware that Kach was liv-

ing there for the first approximately nine years.

6. The complaint in fact names the "McKeesport School District." The proper name is McKeesport Area School District.

the amended complaint,[7] Kach asserted a § 1983 claim based on alleged civil rights violations against the City of McKeesport as well as Carter and Elias. In Count Three, Kach asserted a § 1983 claim based on alleged civil rights violations against Hose, St. Moritz, the McKeesport Area School District, the McKeesport School Board, Carter, Pacella, Abrams, and Burnett. Count Four asserted a negligence claim against Eleanor and Howard Hose as well as Sokol. In Count Five, Kach asserted a negligence claim against St. Moritz. Counts Six and Seven, respectively, asserted an assault claim and a battery claim against Hose. After Kach filed her amended complaint, the Clerk of the District Court entered Hose's default after he, too, failed to plead or otherwise defend within the time required by law.

Following discovery, the defendants who had appeared in this case separately moved for summary judgment in three groups. The first group was made up of the City of McKeesport; Elias; and Carter, in his capacity as the chief of police (collectively, the "McKeesport Defendants"). The second group consisted of St. Moritz alone. The third group was made up of the McKeesport Area School District; the McKeesport School Board; Weinfurtner; Pacella; Abrams; and Carter, in his capacity as a member of the McKeesport School Board (collectively, the "School District Defendants"). The defendants sought summary judgment on a number of different grounds. After a hearing, the District Court granted the defendants' respective motions. *Kach v. Hose*, No. 06–1216, 2008 U.S. Dist. LEXIS 97592, 2008 WL 4279799 (W.D.Pa. Sept. 12, 2008). Focusing its analysis primarily on the defendants' statute-of-limitations defense, the District Court held that Kach's § 1983 claims were time-barred and rejected Kach's arguments that her claims did not accrue until her departure from Hose's house and that either Pennsylvania or federal tolling principles rendered her claims timely. The Court granted summary judgment for Hose based on its conclusion that Hose had not acted under color of state law, an essential element of a § 1983 claim. The District Court also dismissed, on statute-of-limitations grounds, Kach's state-law claim against St. Moritz. Finally, the District Court declined to exercise supplemental jurisdiction over Kach's remaining state-law claims against the defaulting defendants.

This timely appeal followed. Kach contends that the District Court erred in holding that her claims were time-barred; granting summary judgment for Hose on the ground that he was not acting under color of law; and declining to exercise supplemental jurisdiction over her state-law claims.[8]

## II.

This Court exercises plenary review over both the District Court's grant of summary judgment and its conclusion that Kach failed to assert her claims within the applicable limitations period.[9] *See Alexan-*

---

7. The District Court dismissed Count One of the original complaint, which asserted a claim under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c), 1964(c), against the City of McKeesport, Carter and Elias. That ruling is not at issue in this appeal. In her amended complaint, Kach kept the already-dismissed Count One and did not reorder the other counts. In other words, the first count in the amended complaint is labeled Count Two.

8. Kach's appeal has been dismissed with prejudice as to St. Moritz.

9. The District Court had jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1367(a). We have jurisdiction under 28 U.S.C. § 1291.

der v. Nat'l Fire Ins. of Hartford, 454 F.3d 214, 219 n. 4 (3d Cir.2006); *Kingvision Pay–Per–View, Corp. v. 898 Belmont, Inc.,* 366 F.3d 217, 220 (3d Cir.2004). In reviewing the District Court's summary judgment ruling, we are "required to apply the same test the district court should have utilized initially." *Oritani Sav. & Loan Ass'n v. Fidelity & Deposit Co. of Md.,* 989 F.2d 635, 637 (3d Cir.1993) (quotation marks and citation omitted). Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether such relief is warranted, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505. We review the District Court's decision not to exercise supplemental jurisdiction for abuse of discretion. *See De Asencio v. Tyson Foods, Inc.,* 342 F.3d 301, 311 (3d Cir. 2003); *Figueroa v. Buccaneer Hotel Inc.,* 188 F.3d 172, 175 (3d Cir.1999).

### III.

#### A. Statute of Limitations

The District Court dismissed the lion's share of Kach's § 1983 claims on statute-of-limitations grounds.[10] Kach mounts two distinct challenges to that portion of the

District Court's ruling. First, she argues that the District Court erred in its determination of the accrual date of her claims. Second, she asserts that the District Court incorrectly declined to toll the statute of limitations governing her claims under either Pennsylvania or federal law.

#### 1. Accrual

The length of the statute of limitations for a § 1983 claim is governed by the personal injury tort law of the state where the cause of action arose. *Wallace v. Kato,* 549 U.S. 384, 387, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007). The statute of limitations for a § 1983 claim arising in Pennsylvania is two years. 42 Pa. Cons. Stat. § 5524(2); *see also Kost v. Kozakiewicz,* 1 F.3d 176, 189–90 (3d Cir.1993). Federal law governs a cause of action's accrual date. *Genty v. Resolution Trust Corp.,* 937 F.2d 899, 919 (3d Cir.1991). Under federal law, a cause of action accrues, and the statute of limitations begins to run, "when the plaintiff knew or should have known of the injury upon which its action is based." *Sameric Corp. v. City of Philadelphia,* 142 F.3d 582, 599 (3d Cir.1998) (citation omitted); *see also Montgomery v. De Simone,* 159 F.3d 120, 126 (3d Cir. 1998). The determination of the time at which a claim accrues is an objective inquiry; we ask not what the plaintiff actually knew but what a reasonable person should have known. *Barren v. United States,* 839 F.2d 987, 990 (3d Cir.1988). As a general matter, a cause of action accrues at the time of the last event necessary to complete the tort, usually at the time the plaintiff suffers an injury. *See United States v. Kubrick,* 444 U.S. 111, 120, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979). "The

10. The District Court also dismissed Kach's negligence claim against St. Moritz on statute-of-limitations grounds. Because this appeal has been dismissed as to St. Moritz, our review of the District Court's statute-of-limitations ruling centers only on Kach's § 1983 claims.

cause of action accrues even though the full extent of the injury is not then known or predictable. Were it otherwise, the statute would begin to run only after a plaintiff became satisfied that he had been harmed enough, placing the supposed statute of repose in the sole hands of the party seeking relief." *Wallace*, 549 U.S. at 391, 127 S.Ct. 1091 (internal quotation marks and citations omitted).

■ Kach essentially alleges that the School District Defendants knew or should have known of her inappropriate relationship with Hose while she was a student at Cornell and did nothing to prevent that relationship from developing. She also alleges that the McKeesport Defendants did not adequately investigate her disappearance and secure her release from Hose's house. At bottom, the injuries Kach claims to have suffered as a result of those alleged failures are sexual abuse and a deprivation of her liberty, both at Hose's hands. Kach does not dispute that a reasonable person in her position would have known, or would have had reason to know, of both injuries in 1996, and the parties do not dispute that, under Pennsylvania law, Kach's claims were tolled until she attained the age of majority in October 1999. Therefore, Kach's § 1983 claims ordinarily would have expired two years after her eighteenth birthday in October 2001. Kach argues that her purported lack of guardianship as well as her stunted cognitive development during her time with Hose should have been factored into the accrual analysis. In her view, her claims did not accrue until March 2006, when she exposed her true identity to Sparico and subsequently was removed from Hose. To substantiate that position, Kach relies almost exclusively on this Court's decision in *Miller v. Philadelphia Geriatric Center*, 463 F.3d 266 (3d Cir.2006).

In *Miller*, decedent Henry Miller was born with severe retardation and functioned on the level of a young child well into old age. No guardian was ever appointed to represent him despite his mental condition. When in his sixties, Miller was placed in a geriatric center, where his condition worsened over the next couple of years until his death. His sister, Vicki Miller, thereafter sued the United States and her brother's doctors in state court, and her case was later removed to federal court with jurisdiction predicated on the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346. The government moved for summary judgment, arguing that the suit was time-barred because Vicki Miller became aware of her brother's injury on October 31, 1995, when he was admitted to a hospital for a disease that caused his muscles to break down, but did not file suit until September 21, 1999, beyond the FTCA's two-year statute of limitations. Vicki Miller countered that her cause of action accrued on September 24, 1997, the date of her brother's death. The district court agreed with the government and granted its motion for summary judgment.

On appeal, Vicki Miller argued that the district court erred by charging her, rather than her brother, with knowledge of his injury for accrual purposes. We agreed. We explained that although a tort claim ordinarily accrues when the injury occurs, the Supreme Court's decision in *United States v. Kubrick* "carved out a 'discovery rule' exception for FTCA claims involving medical malpractice." *Miller*, 463 F.3d at 271 (citing *Kubrick*, 444 U.S. at 111, 100 S.Ct. 352). Under that rule, "[s]uch claims … accrue not at the time of injury, but rather when a plaintiff knows of both the existence and the cause of his injury." *Id.* (citing *Kubrick*, 444 U.S. at 119–22, 100 S.Ct. 352). While we acknowledged that *Kubrick* made no exception to this rule for the mentally disabled, we also recognized

that other circuits had delineated exceptions in cases where the plaintiff bore no culpability in failing to assert a timely claim. *Id.* at 273.

In deciding whether to apply the rule or the exception to Miller's suit, we reviewed our decision in *Barren v. United States*, in which we applied the rule rather than the exception. Barren was a veteran of the Korean War and, after his return to the United States, was admitted to a veteran's hospital. Although he was mentally competent upon his admittance to the hospital, Barren's condition deteriorated to the point of total incompetence as a result of the actions of government doctors. We held that *Kubrick*'s objective test governed the timeliness of Barren's subsequent FTCA suit against the government because permitting the mentally disabled to exceed the FTCA's limitations period would be "tantamount to ruling that a plaintiff's mental infirmity can extend the statute of limitations[,]" and that "[s]uch extensions have been uniformly rejected by this and other courts of appeals." *Barren*, 839 F.2d at 992. In so holding, we reiterated the Supreme Court's concern in *Kubrick* that "plaintiffs who were injured by the government could … attempt to take advantage of the 'exception' by arguing about when they became incompetent." *Miller*, 463 F.3d at 274. We further held that any delay in appointing Barren a guardian was irrelevant for statute-of-limitations purposes, as such a delay "should [not] work to the detriment of the Government." *Barren*, 839 F.2d at 991 n. 7.

In *Miller*, we determined that *Kubrick*'s objective standard did not govern the timeliness of Miller's suit and that *Barren* was factually distinguishable. We reasoned that "*Barren* addresses only the specific class of plaintiffs who were not only injured by the government, but were also prevented from recognizing their injuries by the government's malfeasance…." *Miller*, 463 F.3d at 274. Noting that Henry Miller's incompetence was congenital and thus predated the government's conduct, we reasoned that "there can be no concern that finding *Kubrick* inapplicable here will encourage disputes over when [he] was rendered incompetent." *Id.* We contrasted Miller's case with that of a minor plaintiff, commenting that *Kubrick*'s objective standard generally applies to minors not because they are personally capable of taking stock of their injuries and asserting their rights, but because they have parents or guardians who are capable of doing so in their stead:

> That is, we impute to their parents or guardian the knowledge of their injury. We do this precisely because a legal minor is not in a position to either understand her injuries or even to bring a claim if she wanted to. It follows that, in the rare instance where a minor did not have either a parent or a guardian, the *Kubrick* standard should not be applied to them because there would be no one to whom we could impute knowledge and, also because the minor herself could not have understood, let alone brought, the claim. Here, we are essentially dealing with a minor—an individual who is so severely mentally incapacitated that his intelligence equates to that of a four-year-old child. Moreover, this "minor" lacked an appropriate legal guardian.

*Id.* at 274–75.

Describing Miller's legal position as "unique" and our holding as "narrow," *id.* at 275, we declined to apply *Kubrick* and instead carved out "a narrow equitable exception to *Kubrick*'s reasonable person standard for mentally incapacitated persons who, for whatever reason, do not have a legally appointed guardian to act in their stead." *Id.* (citations omitted). Accord-

ingly, we vacated the grant of summary judgment for the defendants on Miller's FTCA claim.

█ To establish that she comes within the exception we carved out in *Miller*, Kach advances two main arguments. First, she asserts that during her time at Hose's house she "was completely deprived of a parent or guardian." (Appellant's Br. 27.) Although she does not say so explicitly, Kach evidently urges us not to impute knowledge of her injuries to her parents on the ground that they were either delinquent as guardians or simply did not know of her injuries because they were unaware of the conditions that occasioned her disappearance. That argument is unavailing. Kach has adduced no evidence whatever to show that she did not actually have a guardian before her eighteenth birthday, and the record undermines any allegation to that effect. Indeed, the record suggests that at least one, if not both, of Kach's parents were her legal guardians until she reached the age of majority. Kach does not suggest otherwise. We must similarly reject Kach's related argument that she was effectively denied guardianship because her parents were unaware of the cause of her disappearance and her consequent whereabouts. We have explained that a guardian's mere lack of diligence in asserting the rights of a minor plaintiff does not excuse the minor from statute-of-limitations constraints. *See Lake v. Arnold*, 232 F.3d 360, 371 (3d Cir.2000) (noting that in the "typical" case barring tolling, "where a third party injures a mentally incompetent person and the guardian fails to bring the claim in a timely fashion, ... *tolling would be inappropriate because the guardian had failed to exercise diligence*" (emphasis supplied)). Kach has pointed to no authority

for her apparent position that a minor whose legal guardian for whatever reason fails to assert the minor's rights may avoid a statute of limitations. We believe that *Lake* forecloses such a position.

Even if we presumed that Kach in fact was denied effective guardianship, she lost the benefit of that presumption once she reached the age of majority in 1999 under Pennsylvania law. *See* 23 Pa. Cons.Stat. § 5101(b). Thus, to come within *Miller's* narrow exception, Kach would have to show that she was mentally incompetent and that her mental incompetence predated the government conduct that is alleged to have caused her injuries. She has failed to make such a showing. The only evidence on which Kach relies to demonstrate her mental condition is the declaration of Dr. Lawson Bernstein, a psychiatrist who did not examine Kach in person but reviewed certain materials produced in the course of this litigation and forwarded to him by Kach's lawyer.[11] In his declaration, Bernstein opines, in relevant part, as follows:

1. Ms. Kach was already a psychologically troubled and abused youth prior to the events in question, and therefore particularly at risk for further abuse and control by any adult bent on subjugating her.

2. Ms. Kach was sexually abused/tortured and defacto [sic] abducted by the defendant at the age of 14.

3. Ms. Kach was then continuously subjected to this highly abnormal abusive environment in which her limited adolescent capacity for judgment and associated free will was subjugated to the undue influence of her adult captor.

 . . . .

11. Specifically, Bernstein reviewed the amended complaint, Kach's responses to interrogatories propounded by the defendants, and Kach's deposition. (App. 225.)

5. The highly abnormal and abusive environment ... was inimical to any type of further emotional, cognitive or other critical developmental maturation in Ms. Kach from age 14 onward.

....

7. Even after revealing the nature of her ordeal to another in 2006, Ms. Kach then returned to the home of her captor rather than flee those premises. This is not the act of an adult capable of free will and/or normal judgment.

8. Based on the above highly abnormal and continuously abusive state of affairs, Ms. Kach was bereft of her cognitive faculties and associated capacity for normal adult judgment such that she was unable to fully appreciate the nature of Mr. Hose's abuse of/control over her and to take steps to actively interdict that control and associated abuse. (App. 223–24.)

We do not necessarily reject the possibility that Kach's psychological development was retarded or even arrested during her time with Hose. We cannot, however, agree with Kach's contention that, "as a matter of law, [she] was incompetent from the outset as she was a minor at the time of her initial captivity and never thereafter advanced developmentally." (Appellant's Br. 29 (citation omitted).) Bernstein's declaration simply does not support that contention. It neither says explicitly nor even intimates obliquely that Kach at any time, either before or during her years at Hose's house, suffered from incapacity, as we restrictively understood that term in *Miller. See* 463 F.3d at 275 (noting that Henry Miller's *"profound mental retardation* prevented him from any awareness of his injury or its cause"

(emphasis supplied)). Indeed, even Kach's troubled state before she began living with Hose and her subsequent prolonged subservience to him is a far cry from the total mental disability of plaintiffs in other accrual-delay cases. *E.g., Washington v. United States,* 769 F.2d 1436, 1438–39 (9th Cir.1985) (holding that a claim accrued when a comatose patient died, not when she fell into a years-long coma, because the plaintiff was never aware of her injury or its cause); *Clifford by Clifford v. United States,* 738 F.2d 977, 980 (8th Cir.1984) (holding that the statute of limitations accrued when the minor's father was appointed his guardian and not when the minor became comatose); *Zeidler v. United States,* 601 F.2d 527, 529–30 (10th Cir.1979) (remanding for a determination whether accrual delay was proper where the plaintiffs may not have known they had suffered medical malpractice because they had been lobotomized); *Orlikow v. United States,* 682 F.Supp. 77, 84 (D.D.C.1988) (delaying accrual where the plaintiffs, who had varying forms of mental disorders, were used as test subjects by the Central Intelligence Agency); *cf. Smith v. United States,* 518 F.Supp.2d 139, 162 (D.D.C. 2007) (declining to delay accrual despite the plaintiff's professed "profound global and cognitive impairment" following her daughter's death because her condition was "both less severe and of a much shorter duration" than cases in which accrual was deemed appropriate (internal quotation marks omitted)).

The common thread uniting *Miller* and the other cases cited above is a reluctance to impose *Kubrick's* objective standard in part because the very government conduct at issue in those cases resulted in the plaintiffs' various states of incompetence. *See, e.g., Clifford,* 738 F.2d at 980 ("Here

we deal only with that rare situation where the alleged malpractice itself (and not some preexisting mental condition unconnected with the government) has prevented the claimant from ever obtaining that knowledge."). Kach, in contrast, nowhere tells us that her alleged inability to bring suit was solely due to the government's malfeasance. Even taking the evidence in a light most favorable to Kach, her psychological problems, while certainly substantial, do not constitute the sort of incapacity the law requires to delay accrual of her claims, in keeping with *Miller* and the authority outlined above. Under federal law, it is plain that Kach's claims accrued in 1996, and we decline to stretch *Miller*'s scope so far beyond the "unique" facts and "narrow" holding of that case under the circumstances presented here.

## 2. Tolling

■ As we noted earlier, a § 1983 claim is governed by the statute of limitations that applies to personal injury tort claims in the state in which such a claim arises. *Wallace*, 549 U.S. at 387, 127 S.Ct. 1091. The general rule is that state tolling principles also govern § 1983 claims. *See Hardin v. Straub*, 490 U.S. 536, 539, 109 S.Ct. 1998, 104 L.Ed.2d 582 (1989); *Island Insteel Sys. v. Waters*, 296 F.3d 200, 210 n. 4 (3d Cir.2002). That rule is not absolute. Where state tolling principles contradict

federal law or policy, federal tolling principles may apply in certain limited circumstances. *Lake*, 232 F.3d at 370; *see also Bd. of Regents v. Tomanio*, 446 U.S. 478, 485, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980) (explaining that "federal courts [may] ... disregard an otherwise applicable state rule of law only if the state law is inconsistent with the Constitution and laws of the United States" (internal quotation marks and citation omitted)); *Johnson v. Railway Express Agency*, 421 U.S. 454, 465, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975) ("[C]onsiderations of state law may be displaced where their application would be inconsistent with the federal policy underlying the cause of action under consideration.").

Kach relies on both Pennsylvania and federal tolling law to support her position that, even assuming her claims accrued when she turned eighteen, the statute of limitations for those claims was tolled.

### a. Pennsylvania Tolling

Kach argues that any one of three Pennsylvania tolling principles renders her claims timely. First, she asserts that Pennsylvania law recognizes duress as a statute-of-limitations tolling mechanism. To support that assertion, she relies on two cases: *Schwarz v. Frost*, 40 Pa. D. & C. 4th 364 (Pa.Com.Pl.1998),[12] and *Cooper*

12. *Schwarz* was a legal malpractice suit in which the plaintiff hired the defendant, an attorney, to represent her in an insurance suit and ended up having a sexual relationship with him and becoming pregnant with his child during the representation. After the plaintiff obtained less money in the insurance suit than expected, she sued the attorney, who defended on statute-of-limitations grounds. The plaintiff argued in opposition that the limitations period was tolled because the attorney had threatened her and because she was pregnant with the attorney's child. The trial court noted that "[t]here is very little

case law in Pennsylvania that guides us on the issue of tolling of the statute of limitations by duress in legal malpractice cases[.]" *Schwarz*, 40 Pa. D. & C. 4th at 370. After reviewing duress standards as a matter of general contract law, the court, apparently assuming without deciding that duress was a viable tolling device, held that the plaintiff had failed to show that her "apprehension of bodily harm was sufficient in severity to overcome the mind of a person of ordinary firmness." *Id.* at 373. Accordingly, the court declined to toll the statute of limitations period on duress grounds.

*v. Fidelity–Philadelphia Trust Co.*, 201 F.Supp. 168 (E.D.Pa.1962).[13] Kach's reliance on those cases is misplaced. Neither case actually says that Pennsylvania law permits a duress defense to a statute-of-limitations challenge, and in neither case did the court actually conclude that the duress alleged warranted tolling under the circumstances.[14] In short, neither *Schwarz* nor *Cooper* persuasively indicates that duress may toll the statute of limitations under Pennsylvania law. Our own review of Pennsylvania law on this point leads us to the same conclusion the District Court drew: neither the Supreme Court of Pennsylvania nor either of Pennsylvania's intermediate appellate courts has definitively, or even circumspectly, addressed whether duress may toll the statute of limitations.[15] Without so much as an intimation from the Pennsylvania courts that duress is a cognizable tolling device under Pennsylvania law, we decline Kach's invitation to manufacture such a device on our own initiative.

Second, as an alternative to her duress approach, Kach urges the application of what she refers to in her brief as the Pennsylvania discovery rule. Such a rule exists under Pennsylvania law, as discussed more thoroughly below, but Kach does not explore it in her brief. Instead, she follows up her reference to that rule with a discussion of Pennsylvania's infancy tolling provision, which provides:

> If an individual entitled to bring a civil action is an unemancipated minor at the time the cause of action accrues, the period of minority shall not be deemed a portion of the time period within which the action must be commenced. Such person shall have the same time for commencing an action after attaining majority as is allowed to others by the provisions of this subchapter.

42 Pa. Cons.Stat. § 5533(b)(1)(i).

Kach reached the age of majority under Pennsylvania law on October 14, 1999 and thus had until two years after that date to file her suit. Kach does not dispute that

---

**13.** In *Cooper,* the plaintiff was ousted from his position as a director of a company and thereafter sued his former attorney, alleging that the attorney had masterminded his ouster. The plaintiff opposed the attorney's subsequent summary judgment motion on statute-of-limitations grounds, arguing that he was under a disability "because he was unable to obtain counsel and because defendants threatened to have [him] committed to a mental institution[.]" *Cooper,* 201 F.Supp. at 170. Noting that "[t]here is little authority for the proposition that 'duress' tolls the running of the statute of limitations," *id.,* the district court reviewed general duress principles, as articulated in one case from a California intermediate appellate court and another from the Supreme Court of Washington. Applying those principles, the district court concluded that "even assuming that some or all of the defendants threatened to attempt to have the plaintiff committed to a mental institution, such threats would not constitute 'duress' so as to toll the running of the statute of limitations." *Id.* at 171.

**14.** Of course, neither *Cooper* nor *Schwarz* is binding on this Court. It bears noting as well that *Cooper* is a district court case dating back almost half a century while *Schwarz* is a state trial court opinion that has never been cited in any subsequent published decision.

**15.** Other district courts in this circuit have made similar observations. *See Leatherbury v. City of Philadelphia ex rel. City of Philadelphia Police Dep't,* No. 96–3377, 1998 U.S. Dist. LEXIS 1216, at *7, 1998 WL 47355 (E.D.Pa. Feb. 3, 1998) ("There are no reported cases from which one could fairly conclude that the Pennsylvania Supreme Court would recognize tolling by duress[.]"); *Williams v. Baird,* No. 97–1987, 1997 U.S. Dist. LEXIS 11250, at *6 & n. 3, 1997 WL 438495, at *2 (E.D.Pa. July 22, 1997) (noting that "[t]here is little authority for the proposition that duress tolls the running of the statute of limitations" but applying a duress analysis anyway (quotation marks and citation omitted)).

she failed to do so, but points to a 2002 amendment to the above provision in an effort to excuse her untimeliness. The amendment states as follows:

> If an individual entitled to bring a civil action arising from childhood sexual abuse is under 18 years of age at the time the cause of action accrues, the individual shall have a period of 12 years after attaining 18 years of age in which to commence an action for damages regardless of whether the individual files a criminal complaint regarding the childhood sexual abuse.

42 Pa. Cons.Stat. § 5533(b)(2)(i).

The act adding the amendment provides that the amendment "shall not be applied to revive an action which has been barred by an existing statute of limitations on the effective date of this act." Act of June 28, 2002, P.L. 518, No. 86, § 3. The act's effective date was in August 2002. *Id.* § 4. Because Kach's claims were already time-barred by that date, they are statutorily barred from revival. *Cf. Baselice v. Franciscan Friars Assumption BVM Province,* 879 A.2d 270, 274 n. 1 (2005) (finding Pennsylvania's infancy tolling statute inapplicable because "appellant brought suit beyond even the extended statute of limitations period after reaching the age of majority[ ] and . . . § 5533(b)(2), which tolls the statute of limitations for victims of childhood sexual abuse for twelve years after the age of majority, is not applicable either, as the statute is not retroactive").[16]

 Third, to the extent Kach relies on Pennsylvania's discovery rule, we are likewise unpersuaded. Until recently, "the circumstances under which [Pennsylvania's discovery rule] [could] be invoked depend[ed] on the nature of the injury rather than any specific characteristics unique to the plaintiff that might otherwise prevent her from recognizing her injury as a cause of action; such unique characteristics include[d] one's mental state." *Lake,* 232 F.3d at 367 (citing *Dalrymple v. Brown,* 549 Pa. 217, 701 A.2d 164 (1997) and *Molineux v. Reed,* 516 Pa. 398, 532 A.2d 792 (1987)). In *Miller v. Philadelphia Geriatric Center,* we interpreted the Supreme Court of Pennsylvania's decision in *Fine v. Checcio,* 582 Pa. 253, 870 A.2d 850 (2005), as creating a modicum of maneuvering room for a plaintiff claiming the benefit of the discovery rule on account of her particular circumstances: "While reasonable diligence [under Pennsylvania's discovery rule] is an objective test, it is sufficiently flexible to take into account the differences between persons and their capacity to meet certain situations and the circumstances confronting them at the time in question." *Miller,* 463 F.3d at 276 (alteration, internal quotation marks and

---

**16.** To avoid the amendment's non-retroactivity, Kach advances an argument that is difficult to grasp. She contends that she first realized that her sexual relationship with Hose was improper in 2000, when Hose contacted an attorney to inquire about the possibility of marriage. (Appellant's Br. 49–50 (citing App. 616).) According to Kach, she mistakenly believed that her eighteenth birthday was in October 2000, and thus asserts that her claims did not accrue under Pennsylvania law until that time. Because the amendment's effective date was in August 2002, Kach contends that her claims are timely. That contention is misguided in more ways than one. First, the accrual date of a federal cause of action, as stated earlier, is calculated under federal law, not state law. Second, Kach's eighteenth birthday undisputedly was in 1999. That Kach was under the erroneous impression that her birthday was in 2000 or at any other time is irrelevant, as the plain language of the Pennsylvania statute governing the age of majority establishes that an individual's age is a matter of objective fact, not the individual's subjective belief. *See* 23 Pa. Cons.Stat. § 5101(b) ("[A]n individual 18 years of age and older *shall be deemed an adult*[.] " (emphasis supplied)).

citation omitted).[17] Applying that test in *Miller*, we held that Vicki Miller's state-law wrongful death claim should have been tolled because Henry Miller's mental age, which was that of a four-year-old, was "a 'difference between persons' that must be taken into account under *Fine* . . . to determine whether [he] knew, or, more accurately, was even capable of knowing, that he was injured and the cause of his injury." *Id.* at 276. Accordingly, we held that what Henry Miller knew and when he knew it presented a genuine question of material fact, and therefore vacated the District Court's grant of summary judgment for the defendants.

■ In this case, Kach's recourse to Pennsylvania's discovery rule is unavailing, as she failed to invoke that rule in her opening brief. *See F.D.I.C. v. Deglau*, 207 F.3d 153, 169 (3d Cir.2000). To the extent Kach merely states the name of the rule without putting any flesh on its bones, she is still out of luck, for it is well settled that "a passing reference to an issue will not suffice to bring that issue before this court." *Laborers' Int'l Union of North Am., AFL–CIO v. Foster Wheeler Corp.*, 26 F.3d 375, 398 (3d Cir.1994) (ellipsis, quotation marks and citations omitted).

■ Even assuming no waiver, Kach fares no better. The Supreme Court of Pennsylvania has taught that while "the determination concerning the plaintiff's awareness of the injury and its cause is fact intensive, . . . *courts may resolve the matter at the summary judgment stage where reasonable minds could not differ on the subject.*" *Wilson v. El–Daief*, 600 Pa. 161, 964 A.2d 354, 362 (2009) (emphasis supplied and citations omitted). To invoke the rule, a plaintiff must exercise reasonable diligence in discovering his injury. *Id.* at 363. The burden is on the plaintiff to show reasonable diligence. *Id.* at 362. To meet that burden, "a plaintiff is required to establish that he exhibited those qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interests and the interests of others." *Id.* at 363 n. 6 (internal quotation marks and citation omitted). The record in this case leaves us with the firm conviction that Kach has fallen far short of the mark. Kach deliberately concealed her whereabouts from her parents and law enforcement officers on a number of occasions for the better part of a decade. Furthermore, she made no attempt whatever during her many unaccompanied outings from Hose's house over a period of years to alert anyone to her identity or living conditions until March 2006. Neither before the District Court nor before this Court has Kach presented any evidence to demonstrate that she undertook to ascertain the existence, nature or cause of her injury. Under these circumstances, no reasonable finder of fact could conclude that Kach exercised reasonable diligence.[18] Therefore, as a matter of law she cannot avail herself of Pennsylvania's discovery rule. *See Cochran v. GAF Corp.*, 542 Pa. 210, 666 A.2d 245, 248 (1995) ("[W]e have not hesitated to find as a matter of law that a party has not used reasonable diligence in ascertaining the cause of an injury thus

---

**17.** Such flexibility notwithstanding, it is firmly established that the test governing the Pennsylvania discovery rule is an objective one. *See Wilson v. El–Daief*, 600 Pa. 161, 964 A.2d 354, 366 (Pa.2009); *Fine*, 870 A.2d at 858; *Dalrymple*, 701 A.2d at 167.

**18.** We note as well that, to the extent Kach claims that she exercised reasonable diligence, she concedes in her brief, and stated under oath during her deposition, that she knew as early as 2000 that her relationship with Hose was improper, yet took no legal action until 2006.

barring the party from asserting their claim under the discovery rule."); *see also, e.g., Gatling v. Eaton Corp.*, 807 A.2d 283, 289–90 (2002) (rejecting the application of the discovery rule).

Accordingly, we conclude that Kach's claims are not rescued from untimeliness under any Pennsylvania tolling provision.

### b. Federal Tolling

■■■■ Kach argues that federal tolling principles salvage her claims even if Pennsylvania law does not. She has not credibly shown, however, that Pennsylvania law actually conflicts with federal law or policy, as required for federal tolling to apply. To the extent Kach seeks to expose a conflict by arguing that Pennsylvania law upsets the "remedial purposes of § 1983, namely deterrence and/or compensation," (Appellant's Br. 38), we are unconvinced. Deterrence and compensation surely are goals of § 1983. *See Wyatt v. Cole*, 504 U.S. 158, 161, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992) ("The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." (citation omitted)); *Hardin*, 490 U.S. at 538, 109 S.Ct. 1998 (noting " § 1983's chief goals of compensation and deterrence" (footnote omitted)). But we reject what Kach presents as a categorical proposition that a plaintiff need only invoke those generic interests to avail herself of federal tolling in the § 1983 context. To hold otherwise would impermissibly allow the exception (federal tolling) to swallow the rule (state tolling). *See Robertson v. Wegmann*, 436 U.S. 584, 593, 98 S.Ct. 1991, 56 L.Ed.2d 554 (1978) ("A state statute cannot be considered 'inconsistent' with federal law merely because the statute causes the plaintiff to lose the litigation. If success of the § 1983 action were the only benchmark, there would be no reason at all to look to state law, for the appropriate rule would then always be the one favoring the plaintiff, and its source would be essentially irrelevant.").[19]

Even assuming federal tolling governs Kach's claims because Pennsylvania law conflicts with § 1983, we do not find that any recognized federal tolling principle actually applies in this case. We have articulated three federal equitable tolling principles: "(1) where a defendant actively misleads a plaintiff with respect to her cause of action; (2) where the plaintiff has been prevented from asserting her claim as a result of other extraordinary circumstances; or (3) where the plaintiff asserts her claims in a timely manner but has done so in the wrong forum." *Lake*, 232 F.3d at 370 n. 9 (citing *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1387 (3d Cir.1994)). Kach relies solely on

19. To the extent Kach contends that Pennsylvania statute-of-limitations principles are inconsistent with federal law because there is no allowance for tolling on mental incompetence grounds, we are similarly unswayed. As one of our sister circuits has explained, federal tolling may be applicable where it is *"essential* to the vindication of federal rights." *Heck v. Humphrey*, 997 F.2d 355, 358 (7th Cir.1993) (Posner, J.) (emphasis supplied). No one could seriously contend that tolling the statute of limitations in a § 1983 suit on account of mental incompetence is essential to the vindication of a federal right. At most,

federal law has nothing to say on this point. Furthermore, even if Pennsylvania law is in fact inconsistent with federal case law holding that tolling the limitations period for federal statutes on mental incapacity grounds is permissible under appropriate circumstances, any such inconsistency is not relevant in this case. "Although a state's tolling provisions cannot be inconsistent with the policies underlying § 1983, there is no authority for the proposition that it must be consistent with the federal tolling provisions." *Rotella v. Pederson*, 144 F.3d 892, 897 (5th Cir.1998) (citation omitted).

the "extraordinary circumstances" tolling principle as applied by this Court in *Lake v. Arnold.*

In *Lake,* Elizabeth Lake was born mentally retarded and was sterilized years later by doctors at the direction of her father and step-mother. She later learned that she was sterile after consulting a doctor about the possibility of bearing a child. Thereafter, she sued her father and step-mother as well as the hospital and doctors involved in her surgery under 42 U.S.C. §§ 1983 and 1985(3) and state law. The district court dismissed Elizabeth's claims as time-barred. On appeal, we agreed that Elizabeth's state-law claims were time-barred under Pennsylvania law. We disagreed, however, with the district court's application of Pennsylvania law to her federal claims. Recognizing that " § 1983 and 1985(3) are designed to compensate victims whose federal constitutional or statutory civil rights have been violated and to prevent future abuses of state power[,]" *id.* at 369, we noted that mentally retarded persons such as Elizabeth are a protected class and that forced sterilization exemplified the discrimination against such persons that § 1983 and 1985(3) were designed to remedy. In our view, "[n]ot allowing any tolling, even in an extraordinary situation such as this one, puts Pennsylvania's statute of limitations at odds with the objectives that § 1983 and § 1985(3) foster by barring an individual, especially a member of a protected class, who was deprived, as in this case, of her ability to bring a claim through her guardians, from seeking compensation and deterrence." *Id.* at 370 (footnote omitted). We therefore remanded the case to the district court, instructing that "equitable tolling might be appropriate ... where a guardian conspires to deprive a mentally incompetent person of her constitutional and civil rights[.]" *Id.* at 370–71. We in no way mandated such a result, however.

*See id.* at 371. On the contrary, we highlighted our earlier holding in *Barren* that "mental incompetence is not per se a reason to toll the statute of limitations in federal actions." *Id.* (citation omitted). Elizabeth's case was unique, we said, because her mental incompetence at least partially motivated the injury for which she sought recompense and because "[t]he persons, who should have protected [her] because of her retardation, instead harmed her by having her sterilized so that she could not procreate.... In this instance, equitable tolling would promote Congress's intent in enacting §§ 1983 and 1985. It would give Elizabeth the opportunity she was denied when she was sterilized—adequate representation of her interests—and give her a chance to seek a remedy for her injury." *Id.* at 372.

We agree with the District Court that *Lake* does not carry the day for Kach. *Lake* was *sui generis* in its application of federal tolling. While we certainly did, as Kach points out, permit equitable tolling on account of Elizabeth's mental disability, we did so because her mental disability "motivated, to some degree, the injury that [s]he sought to remedy." *Id.* at 371 (citation omitted). The same cannot be said of Kach. It is unclear what, if any, mental disability Kach is alleged to suffer from, and even if we found that Kach was suffering from a disability, there is no evidence whatever that the alleged constitutional deprivations of which she complains were motivated, in even a minor way, by such a disability. The evidence Kach has marshaled on this point is reed-thin, amounting only to the declaration of a doctor who neither purports to have examined her nor actually says that Kach is, or was at any time, mentally incompetent or otherwise unable to assert her rights. Furthermore, our willingness to apply federal tolling to Elizabeth's suit was predicated in no small

part by her membership in a protected class. *See id.* at 369–70. Kach, in contrast, concedes that she is not a member of a protected class. Finally, an additional basis of our holding in *Lake* was the possibility that Elizabeth's guardians may have conspired to deprive her of her constitutional and civil rights. *Id.* at 371–72. That circumstance is not attendant in this case. These several distinctions place Kach squarely beyond the bounds of *Lake*'s exception.

██ In the absence of a demonstrable conflict between Pennsylvania tolling principles and § 1983, we are persuaded that the law does not permit recourse to federal tolling. And even assuming federal tolling were available to Kach, "[t]he remedy of equitable tolling is extraordinary, and we extend it 'only sparingly.'" *Santos v. United States,* 559 F.3d 189, 197 (3d Cir.2009) (other citation omitted) (quoting *Irwin v. Dep't of Veterans Affairs,* 498 U.S. 89, 96, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990)). The circumstances of Kach's case certainly may be described as "extraordinary" in the vernacular sense of that word. *See* Webster's 3d New Int'l Dictionary 807 (1986) (defining "extraordinary" as "going beyond what is usual, regular, common, or customary"). We nevertheless conclude that Kach has not met her burden of showing that this is one of those extraordinary cases warranting the application of any federal equitable tolling provision. *See Wallace,* 549 U.S. at 396, 127 S.Ct. 1091; *cf. Lyons v. Potter,* 521 F.3d 981, 983 (8th Cir.2008) ("Courts that have allowed equitable tolling based on mental illness have done so only in exceptional circumstances, such as where the complainant is institutionalized or adjudged mentally incompetent." (citations omitted)); *Lopez v. Citibank, N.A.,* 808 F.2d 905, 907 (1st Cir. 1987) (Breyer, J.) ("[W]e believe a federal court should assume that the mental illness was not of a sort that makes it equitable to toll the statute—at least absent a strong reason for believing the contrary." (citation omitted)); *see also, e.g., Biester v. Midwest Health Servs.,* 77 F.3d 1264, 1267–68 (10th Cir.1996) (finding no exceptional circumstances where there was no allegation that the plaintiff was ever adjudged incompetent or institutionalized).

Accordingly, we will affirm the District Court's grant of summary judgment for the School District Defendants and the McKeesport Defendants with respect to Kach's § 1983 claims.

## B. Under Color of State Law

Kach maintains that the District Court erred in granting summary judgment for Hose on her § 1983 claim based on the Court's conclusion that Hose was not acting under color of state law. In its ruling, the District Court reasoned that Hose, having failed to appear in this case, had waived affirmative defenses, including the statute of limitations. The District Court reasoned that it could nevertheless grant summary judgment for Hose because St. Moritz, his former employer and a defendant in this case, had argued in its own summary judgment motion that Hose was not acting under color of state law, and thus that Kach was both on notice of that argument and had an opportunity to rebut it.[20] The District Court agreed that Kach

---

20. As noted earlier, the Clerk of the District Court, in accordance with Federal Rule of Civil Procedure 55(a), entered Hose's default at Kach's request in May 2008. On the same day on which Hose's default was entered, the defendants in this case filed their respective summary judgment motions. It is unclear why Kach, having filed her amended complaint in January 2007, waited until May 2008 to request the entry of Hose's default. For equally unapparent reasons, Kach did not at any time move for the entry of default judg-

could not establish that Hose was acting under color of law.

The Fourteenth Amendment provides that "no State shall ... deprive any person of life, liberty, or property, without due process of law...." U.S. Const. amend. XIV, § 1. The Fourteenth Amendment governs only state conduct, not that of private citizens. *Rendell–Baker v. Kohn*, 457 U.S. 830, 837–38, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982). In other words, "[s]ection 1983 subjects to liability those who deprive persons of federal constitutional or statutory rights 'under color of any statute, ordinance, regulation, custom, or usage' of a state." *Leshko v. Servis*, 423 F.3d 337, 339 (3d Cir.2005) (citation omitted). "Under color of law" and "state action" are interpreted identically under the Fourteenth Amendment. *Id.* at 339; *see also Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir.1995). Thus, a plaintiff seeking to hold an individual liable under § 1983 must establish that she was deprived of a federal constitutional or statutory right by a state actor. *See Benn v. Universal Health Sys.*, 371 F.3d 165, 169–70 (3d Cir.2004).

Although there is no "simple line" between state and private actors, *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001), we have explained that "[t]he principal question at stake is whether there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Leshko*, 423 F.3d at 339 (internal quotation marks and citation omitted). To answer that question, we have outlined three broad tests generated by Supreme Court jurisprudence to determine whether state action exists: (1) "whether the private entity has exercised powers that are traditionally the exclusive prerogative of the state"; (2) "whether the private party has acted with the help of or in concert with state officials"; and (3) whether "the [s]tate has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity." *Mark*, 51 F.3d at 1142 (other alterations, internal quotation marks and citations omitted). Under any test, "[t]he inquiry is fact-specific." *Groman v. Twp. of Manalapan*, 47 F.3d 628, 638 (3d Cir.1995); *see also Crissman v. Dover Downs Entm't Inc.*, 289 F.3d 231, 234 (3d Cir.2002) (en banc) (noting that "the facts are crucial"). Kach relies on only the first and third tests.

We disagree that Hose qualifies as a state actor under the first test. In *Rendell–Baker v. Kohn*, several private school employees asserted § 1983 claims against their employer, a private school, as well as the school's director, alleging First Amendment violations after they had been fired. The majority of the school's operating budget was funded by the state and the school educated special-needs students referred to it by public schools. The Supreme Court held that the school and its director did not act under color of state law when they fired the plaintiffs because

---

ment against Hose pursuant to Federal Rule of Civil Procedure 55(b). As noted above, the District Court determined that it could enter summary judgment for Hose notwithstanding Hose's failure to appear. The District Court reasoned that St. Moritz's summary judgment motion adequately put Kach on notice of any arguments that Hose may have advanced in

his own behalf. Neither before the District Court nor before this Court has Kach ever claimed that she was caught unawares by the District Court's decision essentially to credit Hose with St. Moritz's arguments at summary judgment. As a consequence, she has waived this issue.

"[t]he school ... is not fundamentally different from many private corporations whose business depends primarily on contracts to build roads, bridges, dams, ships, or submarines for the government. Acts of such private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts." *Rendell–Baker*, 457 U.S. at 840–41, 102 S.Ct. 2764. The Court recognized that "the education of maladjusted high school students is a public function" and that state law explicitly provided for that function to be fulfilled, but nevertheless reasoned that the state's "legislative policy choice in no way makes these services the exclusive province of the State." *Id.* at 842, 102 S.Ct. 2764. The Court also rejected the notion that state action could be predicated on the fact that the school was heavily regulated by the state, because "the decisions to discharge the petitioners were not compelled or even influenced by any state regulation." *Id.* at 841, 102 S.Ct. 2764.

We applied the precepts announced in *Rendell–Baker* in *Black v. Indiana Area School District*, 985 F.2d 707 (3d Cir.1993). In *Black*, the plaintiffs were schoolchildren who asserted § 1983 claims against a private bus company, which was under contract with the students' school, and the company's driver, alleging that the driver had molested them while driving them to and from school. Neither the driver nor the company was an officer or employee of the state. We concluded that the defendants, like those in *Rendell–Baker*, while "carrying out a state program at state expense, ... were not performing a function that has been 'traditionally the exclusive prerogative of the state' and there was no state regulation that 'compelled or even influenced' the conduct which is alleged to have violated plaintiffs' constitutional rights." *Id.* at 710–11. We therefore held that the conduct of the bus company and its driver could not "fairly be attributed to the state and that summary judgment in their favor was required." *Id.* at 711.

Here, the only evidence Kach has adduced to show that Hose was performing an exclusive state function is a Pennsylvania statute creating an "Office for Safe Schools," which is authorized, among other things, "to make targeted grants to schools to fund programs which address school violence, including ... [c]omprehensive, districtwide school safety and violence prevention plans." 24 Pa. Cons.Stat. § 13–1302–A(c)(8). Kach reads too much into that statute, as nothing in its plain language suggests that school security is the exclusive province of the state. *Cf. Blum v. Yaretsky*, 457 U.S. 991, 1011, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) (concluding that nursing homes do not perform an exclusive state function despite a state constitutional provision authorizing the legislature to provide care for the needy and because Medicaid statutes did not require the state to provide such care). Furthermore, as in *Rendell–Baker*, the fact that Pennsylvania lawmakers have endowed a state agency with the power to address school violence surely does not make school security the exclusive province of the state.[21] Kach has presented no other

---

21. To the extent Kach argues that Cornell delegated police power to St. Moritz and Hose, such an argument is undermined by the record. It is undisputed that Hose's duties were restricted to "patrolling and supervising entrances, hallways, restrooms and stairwells"; "checking students for hall passes"; "escorting offenders to the principal's office"; and "preventing and/or assisting with any disturbance." (App. 116 (record citations omitted).) These undisputed facts establish that Hose was a security guard with strictly circumscribed duties and jurisdiction, not one imbued with all the powers of a state police officer.

evidence to persuade us that Hose, in his role as a privately-employed school security guard, was performing an exclusive government function, and thus she has not met her heavy burden of showing that he was a state actor under the first test. *Cf. Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 158, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978) ("While many functions have been traditionally performed by governments, very few have been 'exclusively reserved to the State.'"); *Robert S. v. Stetson Sch., Inc.*, 256 F.3d 159, 165 (3d Cir.2001) (noting that the first "test imposes a rigorous standard that is rarely satisfied" (ellipsis, internal quotation marks and citation omitted)).

 Kach's resort to the third test likewise bears no fruit. Under that test, "state action will be found if there is a sufficiently close nexus between the state and the *challenged* action of the regulated entity so that the action may be fairly treated as that of the State itself." *Boyle v. Governor's Veterans Outreach & Assistance Ctr.*, 925 F.2d 71, 76 (3d Cir.1991) (emphasis in original and internal quotation marks and citation omitted). "[T]he purpose of this requirement is 'to assure that constitutional standards are invoked only when it can be said that the State is *responsible* for the *specific conduct* of which the plaintiff complains.'" *Id.* (some emphasis in original) (quoting *Blum*, 457

U.S. at 1004, 102 S.Ct. 2777). "Acts of private contractors do not become acts of the State simply because they are performing public contracts. The State will be held responsible for a private decision only when it has *exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed that of the State.*" *Id.* (emphasis supplied and internal quotation marks and citations omitted).

Kach asserts that Hose was under the supervision of, and reported to, Cornell officials while on duty at the school. She further asserts that Hose sought to be alone with her while at school. Kach's attempts to moor these assertions to portions of the record do her no good, as she has submitted no evidence to demonstrate that Hose specifically used his authority as a security guard either to pursue a friendship and intimate relations with her or to convince her to live with him for ten years. Nor does the evidence on which Kach relies establish that her relationship with Hose was begotten either at the explicit direction or even with the tacit encouragement of Cornell officials. At most, Kach's evidence suggests only that some school officials may have known of Hose's relationship with Kach and failed to stop it. That proffer is not good enough to establish § 1983 liability. *See Am. Mfrs. Mutual Ins. Co. v. Sullivan*, 526 U.S. 40, 52, 119

Kach's reliance on *West v. Atkins*, 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988), is likewise misplaced. In that case, the Supreme Court held that a state-employed doctor providing medical care to prison inmates was a state actor because the state had an absolute and exclusive obligation to provide medical care to those whose liberty it had taken. In the Court's view, only the state could provide that function under the circumstances, and thus the doctor "function[ed] within the state system." *Id.* at 55, 108 S.Ct. 2250. *West* is plainly distinguishable on its facts, as it is well-settled law that public high

school students are not comparable to prisoners or the involuntarily committed because "parents remain the [students'] primary caretakers" and because students "may turn to persons unrelated to the state for help on a daily basis." *D.R. v. Middle Bucks Area Vocational Tech. Sch.*, 972 F.2d 1364, 1371–72 (3d Cir.1992) (en banc). Furthermore, *West* suggests that a state is barred from limiting its responsibility for providing functions that it is constitutionally required to provide. Here, Cornell had no constitutional duty to provide security on its premises.

S.Ct. 977, 143 L.Ed.2d 130 (1999) ("Action taken by private entities with the *mere approval or acquiescence* of the State is not state action." (emphasis supplied and citations omitted)); *Leshko*, 423 F.3d at 341; *Boyle*, 925 F.2d at 77.

Furthermore, Kach ignores that the focus of our inquiry is not on whether the state exercises control over a putative state actor as a general matter, but whether the state has exercised control over the particular conduct that gave rise to the plaintiff's alleged constitutional deprivation. *E.g.*, *Milburn v. Anne Arundel County Dep't of Soc. Servs.*, 871 F.2d 474, 479 (4th Cir.1989) ("The State of Maryland was not responsible for *the specific conduct of which the plaintiff complains*, that is, the physical child abuse itself. It exercised no coercive power over the [abusers]; neither did it encourage them." (emphasis supplied)), *cited with approval in Leshko*, 423 F.3d at 341 n. 3; *see also Nat'l Broad. Co. v. Commc'ns Workers of Am.*, 860 F.2d 1022, 1025 n. 4 (11th Cir.1988) ("[I]f a thread of commonality is to be drawn from the various forms in which state action can manifest itself through the conduct of private parties, it is that attribution is not fair when bottomed solely on a generalized relation with the state. Rather, private conduct is fairly attributable only when the state has had some affirmative role, albeit one of encouragement short of compulsion, *in the particular conduct underlying a claimant's civil rights grievance*." (emphasis supplied and quotation marks and citation omitted)).

On this particular record, no reasonable finder of fact could conclude that Pennsylvania authorities exercised control over any element of the particular conduct Kach describes. Hose was charged with supervising and maintaining a secure environment for schoolchildren. In clear violation of his mandate, Hose engaged in an impermissible relationship with one of the very schoolchildren whose safety he was supposed to ensure. Kach has not presented evidence to suggest that Hose's actions were committed on anyone's initiative but his own or with anything other than his own interests in mind. Instead, the record leaves no room for doubt that Hose "was bent on a singularly personal frolic[,]" *Martinez v. Colon*, 54 F.3d 980, 987 (1st Cir.1995) (footnote omitted), and thus his conduct is not cognizable as state action for § 1983 purposes. *See Mark*, 51 F.3d at 1150 ("It is well settled that an otherwise private tort is not committed under color of law[.]"); *see also Screws v. United States*, 325 U.S. 91, 111, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945) ("It is clear that under 'color' of law means under 'pretense' of law. Thus acts of officers in the ambit of their personal pursuits are plainly excluded."); *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 24 (3d Cir.1997); *Barna v. City of Perth Amboy*, 42 F.3d 809, 816 (3d Cir.1994); *accord Roe v. Humke*, 128 F.3d 1213, 1216 (8th Cir.1997); *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 838 (9th Cir.1996); *Jojola v. Chavez*, 55 F.3d 488, 492–93 (10th Cir.1995); *Pitchell v. Callan*, 13 F.3d 545, 548–49 (2d Cir.1994). Because Hose was not acting under color of state law when he committed the acts that form the basis of Kach's § 1983 claim against him, we need not decide if Kach's constitutional rights were violated. Accordingly, Kach's § 1983 claim against Hose fails as a matter of law.[22]

22. We recognize that Hose was not employed directly by Cornell. Instead, he was an employee of St. Moritz, which had a contract with Cornell. However, because "labels are not dispositive in state action cases[,]" *Leshko*, 423 F.3d at 342 (citing *Brentwood Acad.*, 531 U.S. at 296, 121 S.Ct. 924), the technicalities of Hose's employment status are immaterial for purposes of determining whether Hose acted under color of state law. *Cf. Polk*

## C. Supplemental Jurisdiction

Kach contends that the District Court should have retained jurisdiction over her state-law claims against the defaulting defendants: Hose; his parents; and his friend, Judy Sokol. The District Court determined that those defendants had waived a statute-of-limitations defense by having failed to appear and answer. In the District Court's view, "unless extraordinary circumstances exist, it is inappropriate for a district court to proceed with supplemental state law claims where the underlying federal claim has been dismissed prior to trial." *Kach*, 2008 U.S. Dist. LEXIS 97592, at *27, 2008 WL 4279799, at *9. Concluding that no such circumstances existed in this case, the District Court dismissed Kach's remaining state-law claims without prejudice.

Supplemental jurisdiction in the district courts is governed by 28 U.S.C. § 1367. The statute provides that "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a); *see De Asencio*, 342 F.3d at 308. The statute also permits a district court to decline the exercise of supplemental jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction[.]" 28 U.S.C. § 1367(c)(3) [23]; *see New Rock Asset Partners v. Preferred Entity Advancements, Inc.*, 101 F.3d 1492, 1507 n. 11 (3d Cir.1996). The decision to retain or decline jurisdiction over state-law claims is discretionary. *Annulli v. Panikkar*, 200 F.3d 189, 203 (3d Cir.1999), *overruled on other grounds by Rotella v. Wood*, 528 U.S. 549, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000). That discretion, however, is not unbridled. Rather, the decision "should be based on considerations of 'judicial economy, convenience and fairness to the litigants.'" *New Rock*, 101 F.3d at 1505 (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726–27, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)). If a district court decides not to exercise supplemental jurisdiction and therefore dismisses state-law claims, it should do so without prejudice, as there has been no adjudication on the merits. *See Figueroa*, 188 F.3d at 182.

Here, the District Court plainly recognized its discretion to retain jurisdiction over Kach's remaining state-law claims but, having dismissed all of her federal claims, declined to do so for a reason that Congress explicitly green-lighted under these circumstances. *See* 28 U.S.C. § 1367(c)(3); *see also, e.g., Figueroa*, 188 F.3d at 181. Furthermore, in accordance with our precedents, the District Court's dismissal of Kach's state-law claims was without prejudice. *See, e.g., Elmore v. Cleary*, 399 F.3d 279, 283 (3d Cir.2005); *Heffernan v. Hunter*, 189 F.3d 405, 414 n. 8 (3d Cir.1999). Accordingly, we do not find that the District Court abused its discretion in deciding not to exercise supplemental jurisdiction over Kach's state-law claims.

## IV. CONCLUSION

Kach suffered an indescribable ordeal that essentially stripped her of her adoles-

---

*County v. Dodson*, 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981) (rejecting formalisms in determining whether a public defender was a state actor and considering instead the defender's actual function). We do not foreclose the possibility that, under other circumstances, a private security guard employed in a public school could qualify as a state actor.

**23.** The statute also authorizes district courts to dismiss state-law claims for other reasons that are not relevant here.

cence and young adulthood. Her unique circumstances notwithstanding, we are compelled to conclude that Kach forewent her right to relief in federal court by waiting too long to assert her rights. Accordingly, we will affirm the District Court's grant of summary judgment on statute-of-limitations grounds. We will also affirm the District Court's grant of summary judgment for Hose on the ground that he was not acting under color of law as well as the District Court's dismissal of Kach's state-law claims.[24]

---

**24.** In light of our disposition, we do not reach any of the alternative grounds for affirmance the defendants have advanced.